KEN I. ITO - SBN 279304
**HEMAR, ROUSSO & HEALD, LLP**
15910 Ventura Boulevard, 12th Floor
Encino, California  91436
Telephone:  (818) 501-3800
Facsimile:  (818) 501-2985
Email:  kito@hrhlaw.com

Attorneys for Plaintiff
BMO BANK N.A., national association

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### (FRESNO DIVISION)

| | |
|---|---|
| BMO BANK N.A. fka BMO HARRIS BANK N.A., a national association,<br><br>Plaintiff,<br><br>vs.<br><br>ROYAL ROAD LINE INC, a California corporation; NISHAN SINGH, an individual resident and citizen of California; DOES 1-10,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR BREACH OF CONTRACT** |

Plaintiff, BMO BANK N.A. fka BMO HARRIS BANK N.A., by its attorneys, complains of Defendants, ROYAL ROAD LINE INC and NISHAN SINGH (collectively, the "Defendants") as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this dispute because diversity of citizenship exists between the parties and the amount in controversy exceeds

1

COMPLAINT

1    $75,000.00.  28 U.S.C. § 1332(a).

2        2.    Venue is properly within this district pursuant to, inter alia, 28 U.S.C.

3    § 1391(a)(2).

4        3.    One or more of the Defendants reside within that geographical area known

5    as the Eastern District of California, specifically in Fresno County.  Further, the events

6    that gave rise to the causes of action alleged in this complaint occurred in said District,

7    and the property sought to be recovered in this lawsuit is based within said District.

8                        **PARTIES**

9        4.    Plaintiff BMO BANK N.A. fka BMO HARRIS BANK N.A. ("Plaintiff")

10   is a national association with its main office, as set forth in its articles of association,

11   located in Chicago, Illinois.

12       5.    Defendant ROYAL ROAD LINE INC ("ROYAL") is a corporation

13   organized under the laws of the State of California with its principal place of business

14   located at 5490 North Salinas Avenue, #166, Fresno, California 93722.

15       6.    Defendant NISHAN SINGH ("SINGH") is a citizen of the State of

16   California residing at 5675 North Fresno Street, #113, Fresno, California 93710.

17       7.    SINGH is the owner and officer of ROYAL, a commercial trucking

18   operation.

19       8.    At all relevant times Plaintiff was in the business of providing financing to

20   persons and entities engaged in commercial trucking operations.

21               **BACKGROUND FACTS**

22               **The Agreements**

23   Agreement 18001

24       9.    On or about December 30, 2021, Plaintiff and ROYAL entered into a Loan

25   and Security Agreement with contract number ending 18001 (together with all

26   amendments, modifications, and extensions thereto) ("Agreement 18001"), whereby

27   Plaintiff agreed to finance ROYAL' purchase of the vehicles described therein for use

28   in ROYAL' business (the "18001 Vehicles"), and ROYAL agreed to pay Plaintiff

$183,738.24, including interest, pursuant to the terms and conditions stated therein. A true and correct copy of Agreement 18001 is attached hereto as <u>Exhibit 1</u>.

Agreement 78001

10.    On or about March 10, 2022, Plaintiff and ROYAL entered into a Loan and Security Agreement with contract number ending 78001 (together with all amendments, modifications, and extensions thereto) ("Agreement 78001"), whereby Plaintiff agreed to finance ROYAL' purchase of the vehicles described therein for use in ROYAL's business (the "78001 Vehicles"), and ROYAL agreed to pay Plaintiff $131,263.20, including interest, pursuant to the terms and conditions stated therein. A true and correct copy of Agreement 78001 is attached hereto as <u>Exhibit 2</u>.

Agreement 38001

11.    On or about March 7, 2023, Plaintiff and ROYAL entered into a Loan and Security Agreement with contract number ending 38001 (together with all amendments, modifications, and extensions thereto) ("Agreement 38001"), whereby Plaintiff agreed to finance ROYAL' purchase of the vehicles described therein for use in ROYAL's business (the "38001 Vehicles"), and ROYAL agreed to pay Plaintiff $249,931.20, including interest, pursuant to the terms and conditions stated therein. A true and correct copy of Agreement 38001 is attached hereto as <u>Exhibit 3</u>.

**The Guaranty**

12.    Additionally, in connection with Agreements 18001, 78001, and 38001 (collectively "Agreements"), SINGH executed a Continuing Guaranty, on December 30, 2021, March 10, 2022, and March 7, 2023. True and correct copies of which are attached hereto as <u>Exhibit 4</u> and incorporated herein by this reference. By signing the Continuing Guaranties, SINGH guaranteed the full and timely performance of all of ROYAL's present and future liabilities to Plaintiff (the "Guaranties").

**The Security Interest**

13.    In consideration for entering into the Agreements, ROYAL granted Plaintiff a first-priority security interest in the respective vehicles. Pursuant to the

Agreements, Plaintiff has recovered the 18001 Vehicles and 78001 Vehicles. The remaining vehicle consists of the following ("Remaining Vehicle"):

| Agreement | Year | Make/Model | Vehicle I.D. No. |
|---|---|---|---|
| 38001 | 2024 | Peterbilt 579 | 1XPBD49X3RD639014 |

14.    Plaintiff perfected its security interest in the Remaining Vehicle by recording its lien on the Certificate of Title. A true and correct copy of the Certificate of Title is attached hereto as Exhibit 5.

**Default by Defendants**

15.    Defendants are in default under the Agreement and the Guaranties for their failure to pay the amounts due thereunder.

16.    More specifically, ROYAL failed to make the July 1, 2023 payment due under Agreement 18001 and Agreement 78001, and failed to make the July 7, 2023 payment due under Agreement 38001. Defendants' default under the Agreement and the Guaranties are continuing.

17.    Pursuant to the Agreements, the entire amounts due thereunder have been accelerated. As of the respective dates of default, the principal amount due and owing after acceleration are as follows:

- Agreement 18001:    $107,296.84
- Agreement 78001:    $85,644.05
- Agreement 38001:    $189,395.73

18.    Calculated from the respective dates of default to the dates of acceleration, accrued and unpaid interest due and owing under the Agreements is as follows:

- Agreement 18001:    $883.53
- Agreement 78001:    $605.94
- Agreement 38001:    $1,420.82

19.    Under the Agreements, upon acceleration, Defendants are obligated to pay interest on all unpaid amounts at the default interest rate of 1.5% per month (18% per annum) or the maximum rate not prohibited by applicable law. The Agreements were

accelerated on November 28, 2023. The daily default rates of interest accruing since the dates of acceleration are as follows:

- Agreement 18001:    $53.65
- Agreement 78001:    $42.82
- Agreement 38001:    $94.70

20.    Under the Agreements, Defendants are obligated to pay late charges and other fees described in the Agreements.

21.    As of the respective dates of default, late charges have accrued under the Agreements as follows:

- Agreement 18001:    $956.95
- Agreement 78001:    $546.95
- Agreement 38001:    $1,035.41

22.    Under the Agreements, upon default, Defendants are obligated to pay all expenses of retaking, holding, preparing for sale and selling the Vehicles.

23.    The current expenses incurred for retaking, holding, preparing for sale and selling the Vehicles are as follows:

- Agreement 18001:    $2,500.00
- Agreement 78001:    $2,250.00
- Agreement 38001:    $0.00

24.    Under the Agreements, Defendants are obligated to pay the attorney's fees and costs incurred by Plaintiff in the enforcement of its rights thereunder, including expenses of filing and prosecuting this lawsuit.

25.    By letter dated November 29, 2023, Plaintiff noticed Defendants of their defaults under the Agreements and the Guaranties, and of Plaintiff's election to accelerate the loans evidenced by the Agreements, and made demand upon them to pay the amounts due and surrender the Vehicles. True and correct copies of the letters are attached collectively hereto as Exhibit 6.

26.    Despite demand, Defendants have failed and refused to pay the amount

due and owing under the Agreements and the Guaranties.

27.    Under the Agreements, Plaintiff has the right to, with or without demand or notice, enter any premises where the Remaining Vehicle may be, to take possession of and remove the Remaining Vehicle from the premises.

28.    As of the filing of this lawsuit, Plaintiff has been unable to recover the Remaining Vehicle, and the Remaining Vehicle remains in Defendants' possession or control.

29.    The Agreements expressly provide that Plaintiff and Defendants unconditionally waive their respective rights to a jury trial of any claim or cause of action relating thereto.

30.    Plaintiff has performed any and all conditions and obligation required by it under the Agreements and the Guaranties.

**COUNT I – INJUNCTIVE RELIEF**

31.    Plaintiff incorporates and re-alleges all preceding paragraphs in this Count I.

32.    Defendants continue to possess and utilize, or are capable of utilizing, the Remaining Vehicle for transportation, shipping, and other commercial purposes.

33.    On any given day the Remaining Vehicle is located, or is capable of being located, in diverse places throughout the United States.

34.    The Remaining Vehicle depreciates and deteriorates as a result of the continued use by Defendants, with no commensurate value being conferred to Plaintiff in the form of payments due and owing from Defendants.

35.    Defendants have or should have in place capabilities to identify, locate, and surrender the Remaining Vehicle, which capabilities may now be breaking down.

36.    Plaintiff will suffer irreparable injury for which no adequate remedy at law exists unless Defendants and other persons and firms having knowledge of this injunction are (a) enjoined from continuing to use the Remaining Vehicle; (b) ordered to advise Plaintiff of the location of the Remaining Vehicle; and (c) ordered to

surrender the Remaining Vehicle to Plaintiff.

WHEREFORE, Plaintiff prays that:

a) Defendants and other persons and firms having knowledge of the injunction to be temporarily, preliminarily, and permanently enjoined from using the Remaining Vehicle as of the date of entry of the injunction order;

b) Defendants be ordered to disclose to Plaintiff the precise location of the Remaining Vehicle in order for Plaintiff to reclaim them;

c) Defendants be temporarily, preliminarily, and permanently enjoined from restricting access of Plaintiff to the Remaining Vehicle;

d) Plaintiff be awarded a judgment against Defendants for any damages sustained by Plaintiff;

e) Plaintiff be awarded its costs, attorneys' fees, and interest on all unpaid amounts due and owing; and

f) Plaintiff be granted such other and further relief as shall be just and equitable.

### COUNT II – SPECIFIC PERFORMANCE

37. Plaintiff incorporates and re-alleges all preceding paragraphs in this Count II.

38. In the event of default by Defendants under the Agreements, Defendants are obligated to return the Remaining Vehicle at their expense and to any location that Plaintiff directs.

39. In the event of default by Defendants under the Agreements, Plaintiff is entitled to take possession of the Vehicles or direct Defendants to remove them to a place deemed convenient by Plaintiff.

40. In the event of default by Defendants under the Agreements, Plaintiff is entitled to repossess and remove the Remaining Vehicle, wherever located.

41. Plaintiff has performed its obligations under the Agreements, and is ready, willing, and able to perform under the Agreements.

42.    Despite demand by Plaintiff, Defendants have failed to return the Remaining Vehicle.

WHEREFORE, Plaintiff prays that:

a) Judgment be entered in Plaintiff's favor and against Defendants directing Defendants to specifically perform their obligations under The Agreements, and to return and allow the removal of the Remaining Vehicle;

b) Plaintiff be awarded a judgment against Defendants for any damages sustained by Plaintiff;

c) Plaintiff be awarded its costs, attorneys' fees, and interest on all unpaid amounts due and owing; and

d) Plaintiff be granted such other and further relief as shall be just and equitable.

## COUNT III – CLAIM AND DELIVERY

43.    Plaintiff incorporates and re-alleges all preceding paragraphs in this Count III.

44.    This claim is brought pursuant to Rule 64 of the Federal Rules of Civil Procedure, and the statutes, common law, and rules of the State of California, including California Code of Civil Procedure Section 512.010 et seq.

45.    Pursuant to the Agreements, upon Defendants' default thereunder, Plaintiff is lawfully entitled to possession of the Remaining Vehicle.

46.    The Remaining Vehicle is being wrongfully detained by Defendants.

47.    Because of the transient nature of the Remaining Vehicle, it is difficult to take immediate physical possession of the same.  In light of Defendants' failure to surrender the Remaining Vehicle voluntarily upon Defendants' default and Plaintiff's demand, a reasonable conclusion may be drawn that there is immediate danger that Defendants will conceal, dispose of, ill-treat, or waste the Remaining Vehicle during the pendency of this lawsuit.

48.    By virtue of Defendants' wrongful possession of the Remaining Vehicle, Plaintiff is entitled to and demands immediate possession of the Remaining Vehicle and a judgment for claim and delivery of the Remaining Vehicle.

49.    The Remaining Vehicle has not been taken for any tax, pursuant to statute, nor seized under execution against Plaintiff.

50.    Other than Plaintiff, no other party claims an interest in the Remaining Vehicle.

51.    Based upon the best knowledge, information, and belief of the Remaining Vehicle, and in the absence of an inspection and assuming the Remaining Vehicle is fully functional and in immediately salable condition, the value of the Remaining Vehicle, solely for purposes of setting the amount of any bond to be posted, is approximately $98,572.00.

52.    Based upon the best knowledge, information, and belief of Plaintiff, the Remaining Vehicle are based out of any of Defendants' locations at:

   a. 5490 N Salinas Ave., Fresno, California 93722; or,

   b. At any given time, the Remaining Vehicle may be in various locations throughout the United States.

53.    Plaintiff claims the value of the Remaining Vehicle not delivered to the officer by virtue of the enforcement of a writ for claim and delivery.

WHEREFORE, Plaintiff requests that:

a) An order granting the issuance of writs of possession be entered in favor of Plaintiff, granting Plaintiff possession of the Remaining Vehicle;

b)    Plaintiff be awarded a judgment against Defendants for the value of the Remaining Vehicle if not delivered;

c)    Plaintiff be awarded a judgment against Defendants for damages for detention;

d) Plaintiff be awarded its costs, attorneys' fees, and interest on all unpaid amounts due and owing; and

e)  Plaintiff be granted such other and further relief as shall be just and equitable

## COUNT IV – BREACH OF CONTRACT – ROYAL

54.    Plaintiff incorporates and re-alleges all preceding paragraphs in this Count IV.

55.    Plaintiff has performed all terms and conditions of the Agreements required of Plaintiff.

56.    ROYAL has failed to perform under the Agreements by, among other reasons, failing to make payments under the Agreements when those payments became due.

57.    Under the Agreements, Plaintiff is entitled to contractual money damages from ROYAL as provided therein, as set forth above.

58.    The Agreements provide that Plaintiff shall recover its attorneys' fees, costs of collection, interest, and late fees on all unpaid amounts due and owing.

WHEREFORE, Plaintiff prays that this Court enter a judgment in its favor and against ROYAL in the amount due under the Agreements, the exact amount to be proven at or before trial, plus its attorney's fees, costs, late fees, and interest, together with such other and further relief as shall be just and equitable.

## COUNT V – BREACH OF CONTRACT - SINGH

59.    Plaintiff incorporates and re-alleges all preceding paragraphs in this Count V.

60.    Plaintiff has performed all terms and conditions of the Agreements and Guaranties required of Plaintiff.

61.    SINGH has failed to perform under the Guaranties by, among other reasons, failing to make payments thereunder when those payments became due.

62.    Under the Guaranties, Plaintiff is entitled to recover contractual money damages from ROYAL as provided above.

63.    The Agreements provides that Plaintiff shall recover its attorneys' fees, costs of collection, interest, and late fees on all unpaid amounts due and owing.

COMPLAINT

WHEREFORE, Plaintiff prays that this Court enter a judgment in its favor and against SINGH in the amount due under the Guaranties, the exact amount to be proven at or before trial, plus its attorneys' fees, costs, late fees, and interest, together with such other and further relief as shall be just and equitable.

Dated: December 13, 2023                    HEMAR, ROUSSO & HEALD, LLP


                                            /s/ *Ken I. Ito*
                                            By:_____
                                            Ken I. Ito
                                            Attorneys for Plaintiff
                                            BMO BANK N.A.

# Exhibit 1

 **BMO** Transportation Finance

# LOAN AND SECURITY AGREEMENT

The undersigned debtor, meaning all debtors jointly and severally ("Debtor"), to secure the obligations set forth herein grants to the Lender named below (with its successors and assigns, "Lender") under the terms and provisions of this agreement (this "Agreement") a security interest in the following property (with all present and future attachments, accessions, accessories, replacement parts, repairs and additions or substitutions, "Equipment")

| Year | Manufacturer | Model | Description | Serial Number |
|------|--------------|-------|-------------|---------------|
| 2022 | VOLVO | VNL-SERIES | VNL-SERIES: 780: VNL84T780 6X4 | 4V4NC9EH4NN295916 |

## PAYMENT SCHEDULE

Debtor promises to pay Lender principal plus pre-computed interest and any administrative fee set forth below (the "Total Amount") of **$183,738.24 in 48** installments as follows:

(a) **$3,827.88** on **MARCH 1, 2022** and a like sum on the like date of each month thereafter until fully paid;

(b) in irregular installments as follows:

**# of Payments   Payment Amount   Payment Date**

provided, however, that the final installment shall be in the amount of the then remaining unpaid balance plus any and all other accrued and unpaid sums due hereunder.

The interest under this Agreement is pre-computed. The Total Amount is calculated based on interest accruing at an interest rate of **9.73%** per annum based on a 360-day year of twelve 30-day months, plus the administrative fee, if any, spread over the life of the loan. The total cost of credit includes such accrued interest and the administrative fee of **$150.00** equating to an annual percentage rate of **9.83%** based on a 360-day year of twelve 30-day months. Late payments may affect the actual total amount payable due to payment of delinquency charges and/or increased accrued interest. If the Payment Schedule contains (i) a period of longer than a month before the first Payment Date (the excess number of days herein referred to as a "Stub Period") or (ii) any month or months in which a Payment Amount is either not due or is in an amount less than the accrued interest for such month (in either event, such period herein referred to as a "Skip Period"), then at the option of Lender, to the extent permitted by law, the unpaid and accrued interest for such Stub Period or Skip Period may be added to the unpaid principal amount hereunder and shall thereafter accrue interest at the interest rate set forth above.

**DELINQUENCY: FOR EACH INSTALLMENT NOT PAID WHEN DUE, DEBTOR AGREES TO PAY LENDER A DELINQUENCY CHARGE CALCULATED ON THE AMOUNT OF SUCH INSTALLMENT AT THE RATE OF 5% OF SUCH INSTALLMENT IF NOT PROHIBITED BY LAW, OTHERWISE AT THE HIGHEST RATE THAT DEBTOR CAN LEGALLY OBLIGATE ITSELF TO PAY AND/OR LENDER CAN LEGALLY COLLECT.**

## USE OF PROCEEDS

Lender is hereby irrevocably authorized and directed to disburse the proceeds of this Agreement as follows:

| Amount | Payee (Name and Address) |
|--------|--------------------------|
| $150,000.00 | TEC OF CALIFORNIA INC |
| | 8555 PEDRICK RD |
| | DIXON, CA 95820 |
| | |
| | |
| | |
| | |
| | |
| | |

Disbursement may be made in Lender's name on Debtor's behalf or in Debtor's name. Disbursement in accordance with the above instructions or any written supplement to these instructions will constitute payment and delivery to and receipt by Debtor of all such proceeds.

**PAYMENT ADDRESS:** All amounts payable under this Agreement are payable at Lender's address shown below or at such other address as Lender may specify from time to time in writing. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitations (collectively a "Disputed Payment") must be mailed or delivered to us at the address for billing inquiries shown on the invoice or statement and not to the payment address.

## 1.0   THE EQUIPMENT

1.1   Disclaimer. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE QUALITY, WORKMANSHIP, DESIGN, MERCHANTABILITY, SUITABILITY, OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED. Debtor's obligations hereunder are absolute and unconditional notwithstanding the existence, location or condition of any item of Equipment or its suitability for use in Debtor's business.

1.2   Equipment Receipt and Use. Debtor warrants and agrees that: the proceeds of the loan and the Equipment will be used solely for business and commercial purposes; the Equipment is free from and will be kept free from all liens, claims, security interests and encumbrances other than that created hereby; Debtor will not, without Lender's prior written consent, sell, rent, lend, encumber, pledge, transfer, secrete or otherwise dispose of any of the Equipment, nor will Debtor permit any such act; the Equipment will be maintained in good operating condition, repair and appearance, and will be used and operated with care, only by qualified personnel in the regular course of Debtor's business; the Equipment shall remain personal property and not become part of any real property regardless of the manner of affixation; Lender may inspect the Equipment and all books and records relating to the Equipment or Debtor's performance under this Agreement at all reasonable times and from time to time; the Equipment will be kept at Debtor's place of business which is indicated immediately below Debtor's signature and will not be removed from said location without the prior written consent of Lender, except that an item of Equipment may be used away from said location in the regular course of Debtor's business provided that (a) such item is not removed from the United States (except for occasional use in Canada), and (b) if such item is not returned to said location within 30 days, Debtor will immediately upon Lender's request and each 30 days thereafter until the item is returned report to the then current location thereof to Lender in writing.

1.3   Insurance. Debtor shall at all times bear all risk of loss of, damage to or destruction of the Equipment, and shall notify Lender if any of the Equipment is lost, damaged or destroyed. Debtor agrees to maintain insurance on the Equipment for the actual cash value thereof and for the life of this Agreement, covering all risks of physical loss or damage and such other risks as Lender may require, in form and amount and with insurers chosen by Debtor and satisfactory to Lender. Debtor agrees to deliver promptly to Lender certificates or, if requested, policies of insurance satisfactory to Lender, each with a standard long-form loss-payable endorsement naming Lender, its agent or such other party as Lender may from time to time instruct, and its successors and assigns, as loss-payee as their interests may appear. Each policy shall provide that Lender's interest therein will not be invalidated by the acts, omissions or neglect of anyone other than Lender, and shall provide that coverage may not be canceled or altered by the insurer except upon 30 days prior written notice to Lender. Lender's acceptance of policies in lesser amounts or risks will not be a waiver of Debtor's foregoing obligation. Debtor assigns to Lender all proceeds of any physical damage insurance maintained by Debtor with respect to the Equipment and any and all returned premiums, up to the amount owing hereunder by Debtor. Debtor directs all insurers to pay such proceeds directly to Lender and authorizes Lender to endorse Debtor's name to all remittances without the joinder of Debtor.

821700 - Fund off risk
1.157   12/2020
Doc Request :          8001
PRICING ENGINE 3051839

ORIGINAL FOR BMO HARRIS BANK

**1.4    Compliance With Law.** Debtor shall comply with all laws, rules and regulations applicable to Debtor and/or the operation of the Equipment, including without limitation, the USA PATRIOT Act and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing.

**2.0    SECURITY INTEREST**

**2.1    Security Interest.** Debtor hereby grants to Lender a first priority security interest in the Equipment to secure (a) payment of the Total Amount and all other obligations of Debtor to Lender under this Agreement, (b) the payment and performance of all other debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to Lender, whether under this Agreement or any other agreement, and (c) the payment and performance of all debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to each of Lender's Affiliates ("Liabilities"). For the purposes of this Agreement, an "Affiliate" of any party means and includes any direct or indirect parent, subsidiary or sister entity of that party and any successor or assign of any of them. Any sums at any time owing to Debtor and in the possession of Lender or any such Affiliate shall secure the Liabilities of Debtor to Lender and any Affiliate of Lender. Upon any assignment of this Agreement by Lender, the security interests granted herein will be assigned to and inure to the benefit of such assignee and the Affiliates of such assignee. The security interests granted herein shall continue to be effective regardless of any relating or redelivery of the Equipment to Debtor.

**2.2    Perfection and Preservation of Security Interest.** Debtor agrees, at its own cost and expense: to do everything necessary or desirable to perfect and preserve the security interests granted hereunder; to extinguish or defend any action, proceeding or claim affecting the Equipment; and to pay promptly any taxes, assessments, license fees and other public or private charges when levied or assessed against the Equipment or this Agreement. Debtor authorizes Lender or any officer, employee or designee of Lender to file a financing statement describing the Equipment for itself and as representative of its Affiliates. Debtor agrees to execute and deliver to Lender, upon Lender's request, such documents, records and assurances as Lender deems necessary or advisable to confirm or perfect the security interest in the Equipment and Lender's rights hereunder.

**2.3    Location of Debtor.** (i) If Debtor is a registered organization, its state of organization is in the state set forth immediately below its signature on the last page of this Agreement and Debtor agrees that it will not change its form or state of organization without 30 days prior written notice to Lender. (ii) If Debtor is an individual, his/her principal place of residence is at the address set forth immediately below his/her signature on the last page of this Agreement and, if Debtor changes Debtor's principal residence, Debtor will notify Lender in writing of a change in his/her principal place of residence within 30 days of such change. Debtor agrees to reimburse Lender for all costs incurred by Lender related to any such change.

**3.0    ACCOUNT MANAGEMENT AND PAYMENT PROCESSING**

**3.1    Application of Payments.** All payments made by Debtor to Lender pursuant to this Agreement may be applied by Lender, in its sole and absolute discretion, to delinquency charges, interest and other such charges due hereunder, to principal due hereunder, and to any other Liabilities due hereunder or under any other agreement, in any order and manner selected by Lender. Debtor waives any right it may have to direct the application of any payments made by it to Lender, and Lender may at its option offset and deduct any liability or obligation of Debtor from any or all sums owed by it to Debtor.

**3.2    Debit Transactions.** Lender may but shall not be required to offer Debtor the option of paying any of Debtor's obligations to Lender through printed or electronic checks, drafts or charges ("Debit Transactions"). Each such Debit Transaction may be orally authorized by Debtor, any representative or officer of Debtor or any other party having access to or control of the account upon which the Debit Transaction is to be charged. Debtor authorizes Lender or any officer, employee or designee of Lender to initiate Debit Transactions from Debtor's account in the orally authorized amount plus Lender's then Debit Transaction Fee. This authorization may be cancelled at any time by Debtor giving at least three business days' prior written notice to Debtor's bank and Lender. Debtor authorizes Lender to substitute a Debit Transaction for any check or other remittance submitted by Debtor in the amount of that remittance. Payment by Debit Transactions is not required by Lender nor is its use a factor in the approval of credit.

**3.3    Acceptable Forms of Payment/Payment Processing.** Credit to Debtor's account may be delayed if payment is (a) not received at the address indicated on the related invoice or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include direct debit, wires, company checks and certified checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account is subject to final payment by the institution on which the item of payment was drawn. Debtor hereby agrees that any payment, other than a Disputed Payment, made by Debtor by remittance and received by Lender at an address other than the address specified on the related invoice may be replaced, at Lender's option, by Lender with a substitute written or electronic instrument of equal amount and presented to Debtor's financial institution for payment from the account referenced on the remittance from Debtor.

**3.4    Returned Payments.** If a check, draft or other remittance sent by Debtor or a Debit Transaction authorized by Debtor is returned unpaid or rejected for any reason other than the lack of a proper endorsement by Lender, the application of such payment to Debtor's Liabilities will be reversed and Debtor shall immediately pay Lender the amount of such returned payment, plus any delinquency charge accruing as the result of such reversal. Debtor shall further pay Lender any amount charged to Lender by any depositary institution because of such return and an additional handling charge in the amount of $25, or if applicable law limits or restricts the amount of such reimbursement and/or handling charge, the amounts chargeable under this provision will be limited and/or restricted in accordance with applicable law.

**3.5    Authorization to Share Information.** Lender may receive from and disclose to any individual, corporation, business trust, association, company, partnership, joint venture, or other entity (collectively, the "Entity"), including, without limiting the generality of the foregoing, any Affiliate of Lender and any credit reporting agency or other entity whether or not related to Lender for any purpose, information about Debtor, Debtor's accounts, credit application and credit experience with Lender and Debtor authorizes any Entity to release to Lender or any Affiliate of Lender any information related to Debtor, Debtor's accounts, credit experience and account information regarding Debtor. This shall be continuing authorization for all present and future disclosures of such information made by Lender, or any Entity requested to release such information to Lender.

**3.6    Maximum Interest Rate.** The parties hereto intend to comply with any applicable usury laws. Accordingly, they agree that, any provisions in this Agreement or any other agreement, document or communication to the contrary notwithstanding, this Agreement shall in no event require the payment or permit the collection of interest or any amount in the nature of interest or fees (collectively "Interest Amount") in excess of the maximum amount permitted by applicable law as now or hereafter construed by a court of competent jurisdiction. If any such excess Interest Amount is contracted for, charged or received pursuant to this Agreement, or if all of the principal balance under this Agreement shall be prepaid, or if the maturity of any amount under this Agreement is accelerated, so that under any of such circumstances or any other circumstances whatsoever the Interest Amount contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law as so construed, then in such event (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction. Without limiting the foregoing, all calculations of the interest rate (taking into account all Interest Amounts) contracted for, charged or received with respect to this Agreement which are made for the purpose of determining whether such rate exceeds the maximum lawful rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all Interest Amounts at any time contracted for, charged to or received from Debtor in connection with such indebtedness.

**4.0    PERFORMANCE BY LENDER**

**4.1    Performance.** If Debtor fails to perform any of its obligations hereunder, Lender may, but shall not be obligated to, perform the same for the account of Debtor to protect the interest of Lender or Debtor or both, at Lender's option. Debtor shall immediately repay to Lender any amounts paid by Lender together with interest thereon at the rate payable upon acceleration of Debtor's obligations under this Agreement. Performance by Lender will not constitute a waiver of any default by Debtor.

**4.2    Power of Attorney.** DEBTOR HEREBY APPOINTS LENDER OR ANY OFFICER, EMPLOYEE OR DESIGNEE OF LENDER AS DEBTOR'S ATTORNEY-IN

Page 2 of 6 of Loan and Security Agreement dated DECEMBER 30, 2021 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off /ax
1.16T 12/2020 *
Doc Request : _____ 16001
PRICINGENGINE 3061836

ORIGINAL FOR BMO HARRIS BANK

FACT TO, IN DEBTOR'S OR LENDER'S NAME: (a) PREPARE, EXECUTE AND SUBMIT ANY NOTICE OR PROOF OF LOSS IN ORDER TO REALIZE THE BENEFITS OF ANY INSURANCE POLICY INSURING THE EQUIPMENT; (b) PREPARE, EXECUTE AND FILE ANY AGREEMENT, DOCUMENT, FINANCING STATEMENT, TITLE APPLICATION, INSTRUMENT (OR ANY OTHER WRITING OR RECORD) THAT, IN LENDER'S OPINION, IS NECESSARY TO PERFECT AND/OR GIVE PUBLIC NOTICE OF THE INTERESTS OF LENDER IN ANY EQUIPMENT; AND (c) ENDORSE DEBTOR'S NAME ON ANY REMITTANCE REPRESENTING PROCEEDS OF ANY INSURANCE RELATING TO THE EQUIPMENT OR THE PROCEEDS OF THE SALE, LEASE OR OTHER DISPOSITION OF THE EQUIPMENT (WHETHER OR NOT THE SAME IS A DEFAULT HEREUNDER). This power is coupled with an interest and is irrevocable as long as any Liabilities remain unpaid.

**5.0    DEFAULT AND REMEDIES**

**5.1    Events of Default.** Time is of the essence. An event of default shall occur if: (a) Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement; (b) Debtor or a Guarantor fails to pay any Liabilities when due to Lender or any Affiliate of Lender or is otherwise in default under any other document, agreement or instrument; (c) Debtor or a Guarantor defaults under the terms of any secured indebtedness or indebtedness of a material amount to any other party; (d) Debtor or a Guarantor fails to perform or observe any other term or provision to be performed or observed by it hereunder or under any other instrument or agreement furnished by Debtor or a Guarantor to, or otherwise acquired by, Lender or any Affiliate of Lender; (e) (i) Debtor or a Guarantor becomes insolvent, ceases to do business as a going concern, makes an assignment for the benefit of creditors, or takes advantage of any law for the relief of debtors, or (ii) a petition in bankruptcy or for an arrangement, reorganization, or similar relief is filed by or against Debtor or a Guarantor, or (iii) any property of Debtor or a Guarantor is attached, or a trustee or receiver is appointed for Debtor or a Guarantor or for substantial part of its property, or Debtor or a Guarantor applies for such appointment; (f) any of the Equipment is lost or destroyed; (g) there shall occur an appropriation, confiscation, retention, or seizure of control, custody or possession of any Equipment by any governmental authority, governmental agency or instrumentality (such entities, agencies and instrumentalities, collectively, "Governmental Authority"); (h) Debtor or anyone in the control, custody or possession of any Equipment is accused, alleged or charged by any Governmental Authority to have used any Equipment in connection with the commission or any crime (other than a misdemeanor moving violation); (i) there shall be a material adverse change in any of the (A) condition (financial or otherwise), business performance, prospects, operations or properties of Debtor or a Guarantor, (B) legality, validity or enforceability of this Agreement (C) perfection or priority of the lien granted in favor of Lender pursuant to this Agreement, or (D) ability of the Debtor to repay the Indebtedness or perform its obligations under this Agreement; (j) rights and remedies of Lender under this Agreement are impaired; (k) there shall be a death of majority owner of Debtor or a Guarantor, or there shall be a death of the Debtor or a Guarantor, if an individual; or (l) there shall be any lien, claim or encumbrance on any of the Equipment except in favor of Lender or as otherwise granted herein.

**5.2    Remedies.** Upon the occurrence of an event of default, and at any time thereafter as long as the default continues, Lender may, at its option, with or without notice to Debtor (i) declare this Agreement to be in default, (ii) declare the Indebtedness hereunder to be immediately due and payable, (iii) declare all other debts then owing by Debtor to Lender to be immediately due and payable, and (iv) exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to require Debtor to assemble the Equipment and deliver it to Lender at a place to be designated by Lender and to enter any premises where the Equipment may be without judicial process and take possession thereof. Any property other than Equipment that is in or upon the Equipment at the time of repossession may be taken and held without liability. Any requirement that Lender give reasonable notice regarding the sale or other disposition of Equipment will be met if such notice is mailed to Debtor at its last known address at least ten days before such sale or other disposition. Lender may dispose of any Equipment at a public or private sale or at auction. Lender may buy at any sale and become the owner of the Equipment. Debtor agrees that Lender may bring legal proceedings to enforce the payment and performance of Debtor's obligations hereunder in any court in the State shown in Lender's address set forth herein, and service of process may be made upon Debtor by mailing a copy of the summons to Debtor at its address shown herein. Debtor shall also pay to Lender all expenses of retaking, holding, preparing for sale, selling and the like, including without limitation (a) the reasonable fees of any attorneys retained by Lender, and (b) all other legal expenses incurred by Lender. Debtor agrees that Debtor is liable for any deficiency remaining after any disposition of Equipment after default. Lender may sell the Equipment without giving any warranties as to the Equipment. Lender may disclaim any warranties of title, possession, quiet enjoyment, or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Equipment.

**5.3    Acceleration Interest.** Debtor agrees to pay Lender, upon acceleration of the above indebtedness, interest on all sums then owing hereunder at the rate of 1 1/2% per month if not prohibited by law, otherwise at the highest rate Debtor can legally obligate itself to pay or Lender can legally collect under applicable law.

**6.0    PREPAYMENT**

**6.1    Partial Prepayment and Reschedule.** (a) Debtor does not have the right to prepay only a portion of the balance of this Agreement prior to maturity. (b) If there are several units subject to this Agreement and Lender either (i) requires (as a result of a casualty loss) or (ii) permits all indebtedness that relates to a specific unit to be paid in full, Lender will apply the proceeds identified as relating thereto to the balance due under this Agreement and reschedule the remaining indebtedness under this Agreement over the then remaining term in accordance with the provisions set forth below. (c) If Lender receives one or more remittance(s) in an aggregate amount in excess of the amounts then due and unpaid under this Agreement (other than any amounts paid pursuant to 6.1(b) above) ("Excess Remittances") Lender may, at its option: (i) apply any portion of such Excess Remittances (A) in payment of obligations then due or past due under any other agreement Debtor has with Lender, (B) to the balance due under this Agreement in any manner selected by Lender, with or without rescheduling the remaining indebtedness over the then remaining term; or (ii) return such excess amount to Debtor at its last known address. (d) The interest included in this Agreement is precomputed and accrues in arrears; accordingly, early payment of one or more installments prior to their maturity date may not reduce the total interest payable by Debtor under this Agreement unless Lender reschedules the remaining payments. If Lender reschedules the indebtedness under this Agreement, Lender will deduct the unaccrued portion of interest on the unpaid balance under this Agreement at the time of reschedule (which the parties agree shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Reschedule Date")) calculated using any method selected by Lender as permitted by applicable law, and recalculate precomputed interest on such unpaid balance as of the Effective Reschedule Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Reschedule Date. (e) If Lender permits Debtor to make a partial prepayment pursuant to clause (b)(ii) of this Section, Debtor agrees that it will at the time of such prepayment pay a prepayment fee equal to the pro rata portion of the prepayment fee that would have been paid pursuant to Section 6.2 below if Debtor had prepaid the Indebtedness under this Agreement in full, computed based on the percentage of the outstanding Total Amount being prepaid (for purposes of calculating the outstanding Total Amount, no effect shall be given to any prior prepayments).

**6.2    Prepayment in Full.** Subject to the terms of this provision, Debtor may prepay the Indebtedness under this Agreement in full (but not in part) at any time, so long as Debtor is not in default hereunder; provided, however, that any prepayment that is not paid on a scheduled payment due date shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Prepayment Date"). If the prepayment is made prior to the last twelve months of the contract, Debtor shall pay a prepayment fee equal to the lesser of (a) (x) 1% of the Total Amount outstanding as of the Effective Prepayment Date (for purposes of this calculation, no effect shall be given to any prior prepayments) multiplied by (y) the number of full twelve-month periods remaining until the originally scheduled or later extended due date of the final installment payable under this Agreement as of prepayment, and (b) the maximum prepayment and/or acquisition charge allowed by applicable law. Debtor and Lender acknowledge and agree that the prepayment fee is a reasonable estimate of the actual or anticipated harm sustained by Lender for Debtor's prepayment of the Total Amount. For purposes of calculating the prepayment amount and any prepayment fee, any unearned interest that would accrue after the Effective Prepayment Date shall be excluded from the calculation of the Total Amount outstanding as of the Effective Prepayment Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Prepayment Date. Debtor agrees that all accrued and unpaid late charges and other amounts due from Debtor under this Agreement will be paid concurrently with any such prepayment.

**7.0    ASSIGNMENT AND GENERAL PROVISIONS**

**7.1    Chattel Paper.** The only copy of this Agreement that constitutes "Chattel Paper" for all purposes of the Uniform Commercial Code is the copy marked "ORIGINAL FOR BMO HARRIS BANK" which is delivered to and held by Lender.

**7.2    Assignment and Waiver.** This Agreement may not be assigned by Debtor without the prior written consent of Lender. Lender may sell, transfer or assign any

Page 3 of 5 of Loan and Security Agreement dated DECEMBER 30, 2021 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
421700 - Fund off fax
1.15T 12/2020
Doc Request :     8001
PRICINGENGINE 3051838

ORIGINAL FOR BMO HARRIS BANK

or all rights under this Agreement or sell participations herein without notice to, acknowledgment of, or consent from Debtor. Debtor hereby (a) consents to such assignment or participation and agrees not to assert against Lender or any such assignee or participant any claims, counterclaims, claims in recoupment, abatement, reduction, defenses, or set-offs for breach of warranty or for any other reason which Debtor could assert against Lender, any such assignee or participant or the manufacturer of the Equipment except defenses which cannot be waived under the Uniform Commercial Code, and (b) agrees to make and/or settle any and all claims with regard to the Equipment directly and exclusively against and with the manufacturer. Debtor agrees that no assignee or participant will have any obligations or liabilities under this Agreement to Debtor or to any other person by reason of any assignment or participation. Debtor hereby waives any right of set-off Debtor may now or hereafter have against Lender or any assignee of or participant in this Agreement. Upon Lender's assignment of Lender's entire interest in this Agreement, Lender shall be relieved, from and after the date of such assignment, of any liability for the performance of any obligation of Lender contained in this Agreement or any document executed in conjunction with this Agreement.

**7.3   General.** (a) Waiver of any default shall not be a waiver of any other default. (b) All of Lender's rights are cumulative and not alternative. (c) No waiver or change in this Agreement shall bind Lender unless in writing signed by one of its authorized representatives. (d) Any provision hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. (e) Debtor authorizes Lender to correct patent errors herein and to make changes to this Agreement or to any related schedule that benefit Debtor. In addition, if the funding amount Debtor requests Lender to disburse exceeds the principal portion of the Total Amount due to changes in calculation of taxes, configuration of the Equipment or other factors affecting the cost of the Equipment, and if such an increase is within the limits of Lender's credit approval, Debtor authorizes Lender, upon written notice to Debtor, to increase the principal portion of the Total Amount by not more than fifteen percent and adjust the Total Amount and the installment amounts payable under this Agreement or any related schedule accordingly. (f) Any captions to the provisions of this Agreement are for convenience only and do not limit or affect the application or interpretation of this Agreement. (g) All of the terms and provisions of this Agreement shall apply to and be binding upon Debtor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. (h) The acceptance by Lender of any remittance from a party other than Debtor shall in no way constitute Lender's consent to the transfer of any of the Equipment to such party. (i) Debtor represents and warrants that there is no material pending or threatened investigation by any governmental authority, litigation or other legal proceeding against or involving Debtor. (j) So long as any of the Liabilities remains unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of Debtor's financial statements within 30 days of the end of each of Debtor's fiscal quarters and within 90 days after the end of each of Debtor's fiscal years. Such financial statements shall be prepared in accordance with GAAP and on the same basis (reviewed, audited, etc.) as Debtor's financial statements are currently prepared unless advised by Lender otherwise, at which time Debtor will comply with Lender's request. Debtor represents and warrants that all financial statements delivered will present fairly the financial condition and results of operations and cash flows of the Debtor as of the dates thereof and for the periods then ended. (k) Lender may pay fees to or receive fees from the seller or manufacturer of the Equipment, a broker, or other third party in connection with this Agreement. Such fees may affect the rate, terms and Debtor's total cost hereunder. (l) Debtor hereby agrees to indemnify, defend and hold harmless Lender and its Affiliates and respective principals, directors, officers, employees, representatives, agents and third-party advisors from and against any and all losses, disputes, claims, expenses (including, without limitation, legal expenses), damages and liabilities of whatsoever kind and nature arising out of, in connection with, or relating to the Equipment, this Agreement or any other document related hereto. If allowed by law, the legal expenses shall include the amount of any flat fee, retainer, contingent fee or the hourly charges of any attorney retained by Lender in enforcing any of Lender's rights hereunder or in the prosecution or defense of any litigation related to this Agreement or the transactions contemplated by this Agreement. This indemnification shall survive the termination or expiration of this Agreement.

**7.4   Additional Covenants and Oral Agreement.** THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**7.5   Waiver of Trial By Jury.** LENDER AND DEBTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT. LENDER AND DEBTOR HEREBY, FOR THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, WAIVE ANY RIGHT TO SUE FOR OR COLLECT FROM THE OTHER PARTY ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER AS A RESULT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ENFORCEMENT BY EITHER PARTY OF ITS RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT THAT ANY SUCH DAMAGES ARE PROVEN TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY.

**7.6   Governing Law/Choice of Venue.** Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Illinois and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Illinois (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in Cook County, Illinois, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, however, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction. Lender and Debtor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

**7.7   Execution and Transmission of Documentation.** This Agreement and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) we, Lender, will deliver to you, Debtor, an electronic or paper version of each instrument; (ii) you will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by us in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to us by electronic, facsimile or other means, (iii) we will sign (electronically, digitally or manually, at our option) each signature page (if the instrument requires our signature), and (iv) we will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. You agree that we may convert any Instrument you sign manually into an electronic record and store it in a document management system designated by us, and you hereby agree to adopt the electronic image of your manual signature as your valid and binding electronic signature. You hereby represent and warrant that you have not modified the Instrument sent to you for signature. Upon your one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, we will make the same available to you by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by you, and we may (at our option) retain only a copy of such Instrument and dispose of the version containing your manual signature. We both intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. You agree not to raise as a defense to the enforcement of any Instrument that you executed such Instrument by electronic or digital means or used electronic or other means to transmit your signature on such Instrument. Notwithstanding anything to the contrary herein, we reserve the right to require you to sign any Instrument manually and to deliver to us an original of such Instrument containing your manual signature.

Page 4 of 5 of Loan and Security Agreement dated DECEMBER 30, 2021 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
821700 - Fund off fax
1.15T  12/2020
Doc Request :          B001
PRICING ENGINE 3051830

ORIGINAL FOR BMO HARRIS BANK

## IMPORTANT INFORMATION ABOUT ESTABLISHING A RELATIONSHIP WITH BANK

To help the United States Government fight terrorism and money laundering, Federal law requires us to obtain, verify, and record information that identifies each person or business that opens an account or establishes a relationship. What this means for you: when you open an account or establish a relationship, we will ask for your name, street address, date of birth, and identification number, such as a social security number or taxpayer identification number. For businesses, we will ask for the business name, street address and tax identification number. Federal law requires us to obtain this information. We may also ask to see your driver's license or other identifying documents that will allow us to identify you. We appreciate your cooperation.

## DELIVERY AND ACCEPTANCE OF EQUIPMENT

(Check Appropriate Box)

Debtor's obligations and liabilities to Lender are absolute and unconditional under all circumstances and regardless of any failure of operation or Debtor's loss of possession of any item of Equipment or the cessation or interruption of Debtor's business for any reason whatsoever.

☒ On DECEMBER 30, 2021, the Equipment being purchased with the proceeds of this Agreement was delivered to Debtor with all installation and other work necessary for the proper use of the Equipment completed at a location agreed upon by Debtor; the Equipment was inspected by Debtor and found to be in satisfactory condition in all respects and delivery was unconditionally accepted by Debtor.

☐ The Equipment being purchased with the proceeds of this Agreement has not yet been delivered to or accepted by Debtor and, upon delivery, Debtor agrees to execute such delivery and acceptance certificate as Secured Party requires.

☐ All of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.

Dated:   **DECEMBER 30, 2021**

Debtor(s) hereby acknowledge(s) receipt of an exact copy of this contract.

Lender:   **BMO HARRIS BANK N.A.**

Debtor:   **ROYAL ROAD LINE INC**

By: _____

By: ☒   NISHAN SINGH

Name: _____

Name: **NISHAN SINGH**

Title:   **AUTHORIZED SIGNER**

Title:   **PRESIDENT**

300 E. JOHN CARPENTER FREEWAY
(Street Address)
IRVING, TEXAS 75062-2712
(City, State and Zip Code)

State of Organization:   **CA**

Principal Residence/Chief Executive Office/Place of Business:
5490 N SALINAS APT 115
(Street Address)
**FRESNO, CA 93722**
(City, State and Zip Code)

Billing/Invoice Address:

_____
(Address)

_____
(City, County, State and Zip Code)

When not in use, the Equipment will be kept at:

5490 N SALINAS AVE APT 115
(Equipment Street)
**FRESNO, CA 93722**
(Equipment City, County, State, and Zip)

Page 5 of 5 of Loan and Security Agreement dated DECEMBER 30, 2021 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.15T 12/2020
Doc Request :|      116001
PRICINGENGINE 305 1838

ORIGINAL FOR BMO HARRIS BANK

# Exhibit   2

**BMO** | Transportation Finance

# LOAN AND SECURITY AGREEMENT

The undersigned debtor, meaning all debtors jointly and severally ("Debtor"), to secure the obligations set forth herein grants to the Lender named below (with its successors and assigns, "Lender") under the terms and provisions of this agreement (this "Agreement") a security interest in the following property (with all present and future attachments, accessions, accessories, replacement parts, repairs and additions or substitutions, "Equipment"):

| Year | Manufacturer | Model | Description | Serial Number |
|------|-------------|-------|-------------|---------------|
| 2023 | UTILITY | REFRIGERATED VANS | REFRIGERATED VANS: 53' | 3UTVS2538P6767424 |
| 2022 | THERMO KING | S600 | S600 | 6001359862 |

## PAYMENT SCHEDULE

Debtor promises to pay Lender principal plus pre-computed interest and any administrative fee set forth below (the "Total Amount") of $131,263.20 in 60 installments as follows:

(a) $2,187.72 on MAY 1, 2022 and a like sum on the like date of each month thereafter until fully paid;

(b) In irregular installments as follows:

| # of Payments | Payment Amount | Payment Date |
|---------------|----------------|--------------|

provided, however, that the final installment shall be in the amount of the then remaining unpaid balance plus any and all other accrued and unpaid sums due hereunder.

The interest under this Agreement is pre-computed. The Total Amount is calculated based on interest accruing at an interest rate of 8.49% per annum based on a 360-day year of twelve 30-day months, plus the administrative fee, if any, spread over the life of the loan. The total cost of credit includes such accrued interest and the administrative fee of $0.00 equating to an annual percentage rate of 8.49% based on a 360-day year of twelve 30-day months. Late payments may affect the actual total amount payable due to payment of delinquency charges and/or increased accrued interest. If the Payment Schedule contains (i) a period of longer than a month before the first Payment Date (the excess number of days herein referred to as a "Stub Period") or (ii) any month or months in which a Payment Amount is either not due or is in an amount less than the accrued interest for such month (in either event, such period herein referred to as a "Skip Period"), then at the option of Lender, to the extent permitted by law, the unpaid and accrued interest for such Stub Period or Skip Period may be added to the unpaid principal amount hereunder and shall thereafter accrue interest at the interest rate set forth above.

DELINQUENCY: FOR EACH INSTALLMENT NOT PAID WHEN DUE, DEBTOR AGREES TO PAY LENDER A DELINQUENCY CHARGE CALCULATED ON THE AMOUNT OF SUCH INSTALLMENT AT THE RATE OF 5% OF SUCH INSTALLMENT IF NOT PROHIBITED BY LAW, OTHERWISE AT THE HIGHEST RATE THAT DEBTOR CAN LEGALLY OBLIGATE ITSELF TO PAY AND/OR LENDER CAN LEGALLY COLLECT.

## USE OF PROCEEDS

Lender is hereby irrevocably authorized and directed to disburse the proceeds of this Agreement as follows:

| Amount | Payee (Name and Address) |
|--------|--------------------------|
| $108,135.00 | UTILITY TRI STATE INC |
| | 3806 MULBERRY HWY 64 WEST |
| | ALMA, AR 72921 |

Disbursement may be made in Lender's name on Debtor's behalf or in Debtor's name. Disbursement in accordance with the above instructions or any written supplement to these instructions will constitute payment and delivery and receipt by Debtor of all such proceeds.

PAYMENT ADDRESS: All amounts payable under this Agreement are payable at Lender's address shown below or at such other address as Lender may specify from time to time in writing. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitations (collectively a "Disputed Payment") must be mailed or delivered to us at the address for billing inquiries shown on the invoice or statement and not to the payment address.

### 1.0    THE EQUIPMENT

1.1    Disclaimer. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE QUALITY, WORKMANSHIP, DESIGN, MERCHANTABILITY, SUITABILITY, OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED. Debtor's obligations hereunder are absolute and unconditional notwithstanding the existence, location or condition of any item of Equipment or its suitability for use in Debtor's business.

1.2    Equipment Receipt and Use. Debtor warrants and agrees that: the proceeds of the loan and the Equipment will be used solely for business and commercial purposes; the Equipment is free from and will be kept free from all liens, claims, security interests and encumbrances other than that created hereby; Debtor will not, without Lender's prior written consent, sell, rent, lend, encumber, pledge, transfer, secrete or otherwise dispose of any of the Equipment, nor will Debtor permit any such act; the Equipment will be maintained in good operating condition, repair and appearance, and will be used and operated with care, only by qualified personnel in the regular course of Debtor's business; the Equipment shall remain personal property and not become part of any real property regardless of the manner of affixation; Lender may inspect the Equipment and all books and records relating to the Equipment or Debtor's performance under this Agreement at all reasonable times and from time to time; the Equipment will be kept at Debtor's place of business which is indicated immediately below Debtor's signature and will not be removed from said location without the prior written consent of Lender, except that an item of Equipment may be used away from said location in the regular course of Debtor's business provided that (a) such item is not removed from the United States (except for occasional use in Canada), and (b) if such item is not returned to said location within 30 days, Debtor will immediately upon Lender's request and each 30 days thereafter until the item is returned report the then current location thereof to Lender in writing.

1.3    Insurance. Debtor shall at all times bear all risk of loss of, damage to or destruction of the Equipment, and shall notify Lender if any of the Equipment is lost, damaged or destroyed. Debtor agrees to maintain insurance on the Equipment for the actual cash value thereof and for the life of this Agreement, covering all risks of physical loss or damage and such other risks as Lender may require, in form and amount and with insurers chosen by Debtor and satisfactory to Lender. Debtor agrees to deliver promptly to Lender certificates or, if requested, policies of insurance satisfactory to Lender, each with a standard long-form loss-payable endorsement naming Lender, its agent or such other party as Lender may from time to time instruct, and its successors and assigns, as loss-payee as their interests may appear. Each policy shall provide that Lender's interest therein will not be invalidated by the acts, omissions or neglect of anyone other than Lender, and shall provide that coverage may not be canceled or altered by the insurer except upon 30 days prior written notice to Lender. Lender's acceptance of policies in lesser

Page 1 of 5 of Loan and Security Agreement dated MARCH 10, 2022 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
821700 - Fund off fax
1.16T 12/2020
Doc Request :    78001
PRICINGENGINE 3070502                                    ORIGINAL FOR BMO HARRIS BANK

amounts or risks will not be a waiver of Debtor's foregoing obligation. Debtor assigns to Lender all proceeds of any physical damage insurance maintained by Debtor with respect to the Equipment and any and all returned premiums, up to the amount owing hereunder by Debtor. Debtor directs all insurers to pay such proceeds directly to Lender and authorizes Lender to endorse Debtor's name to all remittances without the joinder of Debtor.

**1.4** Compliance With Law. Debtor shall comply with all laws, rules and regulations applicable to Debtor and/or the operation of the Equipment, including without limitation, the USA PATRIOT Act and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing.

## 2.0 SECURITY INTEREST

**2.1** Security Interest. Debtor hereby grants to Lender a first priority security interest in the Equipment to secure (a) payment of the Total Amount and all other obligations of Debtor to Lender under this Agreement, (b) the payment and performance of all other debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to Lender, whether under this Agreement or any other agreement, and (c) the payment and performance of all debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to each of Lender's Affiliates ("Liabilities"). For the purposes of this Agreement, an "Affiliate" of any party means and includes any direct or indirect parent, subsidiary or sister entity of that party and any successor or assign of any of them. Any sums at any time owing to Debtor and in the possession of Lender or any such Affiliate shall secure the Liabilities of Debtor to Lender and any Affiliate of Lender. Upon any assignment of this Agreement by Lender, the security interests granted herein will be assigned to and inure to the benefit of such assignee and the Affiliates of such assignee. The security interests granted herein shall continue to be effective regardless of any relaxing or redelivery of the Equipment to Debtor.

**2.2** Perfection and Preservation of Security Interest. Debtor agrees, at its own cost and expense: to do everything necessary or desirable to perfect and preserve the security interests granted hereunder; to extinguish or defend any action, proceeding or claim affecting the Equipment; and to pay promptly any taxes, assessments, license fees and other public or private charges when levied or assessed against the Equipment or this Agreement. Debtor authorizes Lender or any officer, employee or designee of Lender to file a financing statement describing the Equipment for itself and as representative of its Affiliates. Debtor agrees to execute and deliver to Lender, upon Lender's request, such documents, records and assurances as Lender deems necessary or advisable to confirm or perfect the security interest in the Equipment and Lender's rights hereunder.

**2.3** Location of Debtor. (i) If Debtor is a registered organization, its state of organization is in the state set forth immediately below its signature on the last page of this Agreement and Debtor agrees that it will not change its form or state of organization without 30 days prior written notice to Lender. (ii) If Debtor is an individual, his/her principal place of residence is at the address set forth immediately below his/her signature on the last page of this Agreement and, if Debtor changes Debtor's principal residence, Debtor will notify Lender in writing of a change in his/her principal place of residence within 30 days of such change. Debtor agrees to reimburse Lender for all costs incurred by Lender related to any such change.

## 3.0 ACCOUNT MANAGEMENT AND PAYMENT PROCESSING

**3.1** Application of Payments. All payments made by Debtor to Lender pursuant to this Agreement may be applied by Lender, in its sole and absolute discretion, to delinquency charges, interest and other such charges due hereunder, to principal due hereunder, and to any other Liabilities due hereunder or under any other agreement, in any order and manner selected by Lender. Debtor waives any right it may have to direct the application of any payments made by it to Lender, and Lender may at its option offset and deduct any liability or obligation of Debtor from any or all sums owed by it to Debtor.

**3.2** Debit Transactions. Lender may but shall not be required to offer Debtor the option of paying any of Debtor's obligations to Lender through printed or electronic checks, drafts or charges ("Debit Transactions"). Each such Debit Transaction may be orally authorized by Debtor, any representative or officer of Debtor or any other party having access to or control of the account upon which the Debit Transaction is to be charged. Debtor authorizes Lender or any officer, employee or designee of Lender to initiate Debit Transactions from Debtor's account in the orally authorized amount plus Lender's then Debit Transaction Fee. This authorization may be canceled at any time by Debtor giving at least three business days' prior written notice to Debtor's bank and Lender. Debtor authorizes Lender to substitute a Debit Transaction for any check or other remittance submitted by Debtor in the amount of that remittance. Payment by Debit Transactions is not required by Lender nor is its use a factor in the approval of credit.

**3.3** Acceptable Forms of Payment/Payment Processing. Credit to Debtor's account may be delayed if payment is (a) not received at the address indicated on the related invoice or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include direct debit, wires, company checks and certified checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account is subject to final payment by the institution on which the item of payment was drawn. Debtor hereby agrees that any payment, other than a Disputed Payment, made by Debtor by remittance and received by Lender at an address other than the address specified on the related invoice may be replaced, at Lender's option, by Lender with a substitute written or electronic instrument of equal amount and presented to Debtor's financial institution for payment from the account referenced on the remittance from Debtor.

**3.4** Returned Payments. If a check, draft or other remittance sent by Debtor or a Debit Transaction authorized by Debtor is returned unpaid or rejected for any reason other than the lack of a proper endorsement by Lender, the application of such payment to Debtor's Liabilities will be reversed and Debtor shall immediately pay Lender the amount of such returned payment, plus any delinquency charge accruing as the result of such reversal. Debtor shall further pay Lender any amount charged to Lender by any depositary institution because of such return and an additional handling charge in the amount of $25, or if applicable law limits or restricts the amount of such reimbursement and/or handling charge, the amounts chargeable under this provision will be limited and/or restricted in accordance with applicable law.

**3.5** Authorization to Share Information. Lender may receive from and disclose to any individual, corporation, business trust, association, company, partnership, joint venture, or other entity (collectively, the "Entity"), including, without limiting the generality of the foregoing, any Affiliate of Lender and any credit reporting agency or other entity whether or not related to Lender for any purpose, information about Debtor, Debtor's accounts, credit application and credit experience with Lender and Debtor authorizes any Entity to release to Lender or any Affiliate of Lender any information related to Debtor, Debtor's accounts, credit experience and account information regarding Debtor. This shall be continuing authorization for all present and future disclosures of such information made by Lender, or any Entity requested to release such information to Lender.

**3.6** Maximum Interest Rate. The parties hereto intend to comply with any applicable usury laws. Accordingly, they agree that, any provisions in this Agreement or any other agreement, document or communication to the contrary notwithstanding, this Agreement shall in no event require the payment or permit the collection of interest or any amount in the nature of interest or fees (collectively "Interest Amount") in excess of the maximum amount permitted by applicable law as now or hereafter construed by a court of competent jurisdiction. If any such excess Interest Amount is contracted for, charged or received pursuant to this Agreement, or if all of the principal balance under this Agreement shall be prepaid, or if the maturity of any amount under this Agreement is accelerated, so that under any of such circumstances or any other circumstance whatsoever the Interest Amount contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law as so construed, then in such event: (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction. Without limiting the foregoing, all calculations of the interest rate (taking into account all interest Amounts) contracted for, charged or received with respect to this Agreement which are made for the purpose of determining whether such rate exceeds the maximum lawful rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all interest Amounts at any time contracted for, charged to or received from Debtor in connection with such indebtedness.

## 4.0 PERFORMANCE BY LENDER

**4.1** Performance. If Debtor fails to perform any of its obligations hereunder, Lender may, but shall not be obligated to, perform the same for the account of Debtor to protect the interest of Lender or Debtor or both, at Lender's option. Debtor shall immediately repay to Lender any amounts paid by Lender together with

Page 2 of 5 of Loan and Security Agreement dated MARCH 10, 2022 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off tax
1.1ST 12/2020
Doc Request:     78001
PRICINGENGINE 3079502

ORIGINAL FOR BMO HARRIS BANK

Interest thereon at the rate payable upon acceleration of Debtor's obligations under this Agreement. Performance by Lender will not constitute a waiver of any default by Debtor.

**4.2     Power of Attorney.** DEBTOR HEREBY APPOINTS LENDER OR ANY OFFICER, EMPLOYEE OR DESIGNEE OF LENDER AS DEBTOR'S ATTORNEY-IN FACT TO, IN DEBTOR'S OR LENDER'S NAME: (a) PREPARE, EXECUTE AND SUBMIT ANY NOTICE OR PROOF OF LOSS IN ORDER TO REALIZE THE BENEFITS OF ANY INSURANCE POLICY INSURING THE EQUIPMENT; (b) PREPARE, EXECUTE AND FILE ANY AGREEMENT, DOCUMENT, FINANCING STATEMENT, TITLE APPLICATION, INSTRUMENT (OR ANY OTHER WRITING OR RECORD) THAT, IN LENDER'S OPINION, IS NECESSARY TO PERFECT AND/OR GIVE PUBLIC NOTICE OF THE INTERESTS OF LENDER IN ANY EQUIPMENT; AND (c) ENDORSE DEBTOR'S NAME ON ANY REMITTANCE REPRESENTING PROCEEDS OF ANY INSURANCE RELATING TO THE EQUIPMENT OR THE PROCEEDS OF THE SALE, LEASE OR OTHER DISPOSITION OF THE EQUIPMENT (WHETHER OR NOT THE SAME IS A DEFAULT HEREUNDER). This power is coupled with an interest and is irrevocable as long as any Liabilities remain unpaid.

**5.0     DEFAULT AND REMEDIES**

**5.1     Events of Default.** Time is of the essence. An event of default shall occur if: (a) Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement; (b) Debtor or a Guarantor fails to pay any Liabilities when due to Lender or any Affiliate of Lender or is otherwise in default under any other document, agreement or instrument; (c) Debtor or a Guarantor defaults under the terms of any secured indebtedness or indebtedness of a material amount to any other party; (d) Debtor or a Guarantor fails to perform or observe any other term or provision to be performed or observed by it hereunder or under any other instrument or agreement furnished by Debtor or a Guarantor to, or otherwise acquired by, Lender or any Affiliate of Lender; (e) (i) Debtor or a Guarantor becomes insolvent, ceases to do business as a going concern, makes an assignment for the benefit of creditors, or takes advantage of any law for the relief of debtors, or (ii) a petition in bankruptcy or for an arrangement, reorganization, or similar relief is filed by or against Debtor or a Guarantor, or (iii) any property of Debtor or a Guarantor is attached, or a trustee or receiver is appointed for Debtor or a Guarantor or for substantial part of its property, or Debtor or a Guarantor applies for such appointment; (f) any of the Equipment is lost or destroyed; (g) there shall occur an appropriation, confiscation, retention, or seizure of control, custody or possession of any Equipment by any governmental authority, governmental agency or instrumentality (such entities, agencies and instrumentalities, collectively, "Governmental Authority"); (h) Debtor or anyone in the control, custody or possession of any Equipment is accused, alleged or charged by any Governmental Authority to have used any Equipment in connection with the commission or any crime (other than a misdemeanor moving violation); (i) there shall be a material adverse change in any of the (A) condition (financial or otherwise), business performance, prospects, operations or properties of Debtor or a Guarantor, (B) legality, validity or enforceability of this Agreement (C) perfection or priority of the lien granted in favor of Lender pursuant to this Agreement, or (D) ability of the Debtor to repay the indebtedness or perform its obligations under this Agreement; (j) rights and remedies of Lender under this Agreement are impaired; (k) there shall be a death of majority owner of Debtor or a Guarantor, or there shall be a death of the Debtor or a Guarantor, if an individual; or (l) there shall be any lien, claim or encumbrance on any of the Equipment except in favor of Lender or as otherwise granted herein.

**5.2     Remedies.** Upon the occurrence of an event of default, and at any time thereafter as long as the default continues, Lender may, at its option, with or without notice to Debtor (i) declare this Agreement to be in default, (ii) declare the indebtedness hereunder to be immediately due and payable, (iii) declare all other debts then owing by Debtor to Lender to be immediately due and payable, and (iv) exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to require Debtor to assemble the Equipment and deliver it to Lender at a place to be designated by Lender and to enter any premises where the Equipment may be without judicial process and take possession thereof. Any property other than Equipment that is in or upon the Equipment at the time of repossession may be taken and held without liability. Any requirement that Lender give reasonable notice regarding the sale or other disposition of Equipment will be met if such notice is mailed to Debtor at its last known address at least ten days before such sale or other disposition. Lender may dispose of any Equipment at a public or private sale or at auction. Lender may buy at any sale and become the owner of the Equipment. Debtor agrees that Lender may bring legal proceedings to enforce the payment and performance of Debtor's obligations hereunder in any court in the State shown in Lender's address set forth herein, and service of process may be made upon Debtor by mailing a copy of the summons to Debtor at its address shown herein. Debtor shall also pay to Lender all expenses of retaking, holding, preparing for sale, selling and the like, including without limitation (a) the reasonable fees of any attorneys retained by Lender, and (b) all other legal expenses incurred by Lender. Debtor agrees that Debtor is liable for any deficiency remaining after any disposition of Equipment after default. Lender may sell the Equipment without giving any warranties as to the Equipment. Lender may disclaim any warranties of title, possession, quiet enjoyment, or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Equipment.

**5.3     Acceleration Interest.** Debtor agrees to pay Lender, upon acceleration of the above indebtedness, interest on all sums then owing hereunder at the rate of 1 1/2% per month if not prohibited by law, otherwise at the highest rate Debtor can legally obligate itself to pay or Lender can legally collect under applicable law.

**6.0     PREPAYMENT**

**6.1     Partial Prepayment and Reschedule.** (a) Debtor does not have the right to prepay only a portion of the balance of this Agreement prior to maturity. (b) If there are several units subject to this Agreement and Lender either (i) requires (as a result of a casualty loss) or (ii) permits all indebtedness that relates to a specific unit to be paid in full, Lender will apply the proceeds identified as relating thereto to the balance due under this Agreement and reschedule the remaining indebtedness under this Agreement over the then remaining term in accordance with the provisions set forth below. (c) If Lender receives one or more remittance(s) in an aggregate amount in excess of the amounts then due and unpaid under this Agreement (other than any amounts paid pursuant to 6.1(b) above) ("Excess Remittances") Lender may, at its option: (i) apply any portion of such Excess Remittances (A) in payment of obligations then due or past due under any other agreement Debtor has with Lender, (B) to the balance due under this Agreement in any manner selected by Lender, with or without rescheduling the remaining indebtedness over the then remaining term; or (ii) return such excess amount to Debtor at its last known address. (d) The interest included in this Agreement is precomputed and accrues in arrears; accordingly, early payment of one or more installments prior to their maturity date may not reduce the total interest payable by Debtor under this Agreement unless Lender reschedules the remaining payments. If Lender reschedules the indebtedness under this Agreement, Lender will deduct the unaccrued portion of interest on the unpaid balance under this Agreement at the time of reschedule (which the parties agree shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Reschedule Date")) calculated using any method selected by Lender as permitted by applicable law, and recalculate precomputed interest on such unpaid balance as of the Effective Reschedule Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Reschedule Date. (e) If Lender permits Debtor to make a partial prepayment pursuant to clause (b)(ii) of this Section, Debtor agrees that it will at the time of such prepayment pay a prepayment fee equal to the pro rata portion of the prepayment fee that would have been paid pursuant to Section 6.2 below if Debtor had prepaid the indebtedness under this Agreement in full, computed based on the percentage of the outstanding Total Amount being prepaid (for purposes of calculating the outstanding Total Amount, no effect shall be given to any prior prepayments).

**6.2     Prepayment in Full.** Subject to the terms of this provision, Debtor may prepay the indebtedness under this Agreement in full (but not in part) at any time, so long as Debtor is not in default hereunder; provided, however, that any prepayment that is not paid on a scheduled payment due date shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Prepayment Date"). If the prepayment is made prior to the last twelve months of the contract, Debtor shall pay a prepayment fee equal to the lesser of (a) (x) 1% of the Total Amount outstanding as of the Effective Prepayment Date (for purposes of this calculation, no effect shall be given to any prior prepayments) multiplied by (y) the number of full twelve-month periods remaining until the originally scheduled or later extended due date of the final installment payable under this Agreement as of prepayment, and (b) the maximum prepayment and/or acquisition charge allowed by applicable law. Debtor and Lender acknowledge and agree that the prepayment fee is a reasonable estimate of the actual or anticipated harm sustained by Lender for Debtor's prepayment of the Total Amount. For purposes of calculating the prepayment amount and any prepayment fee, any unearned interest that would accrue after the Effective Prepayment Date shall be excluded from the calculation of the Total Amount outstanding as of the Effective Prepayment Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Prepayment Date. Debtor agrees that all accrued and unpaid late charges and other amounts due from Debtor under this Agreement will be paid concurrently with any such prepayment.

**7.0     ASSIGNMENT AND GENERAL PROVISIONS**

Page 3 of 5 of Loan and Security Agreement dated MARCH 10, 2022 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.15T 12/202^
Doc Request     78001
PRICINGENGINE 3079502

ORIGINAL FOR BMO HARRIS BANK

**7.1** **Chattel Paper.** The only copy of this Agreement that constitutes "Chattel Paper" for all purposes of the Uniform Commercial Code is the copy marked "ORIGINAL FOR BMO HARRIS BANK" which is delivered to and held by Lender.

**7.2** **Assignment and Waiver.** This Agreement may not be assigned by Debtor without the prior written consent of Lender. Lender may sell, transfer or assign any or all rights under this Agreement or sell participations herein without notice to, acknowledgment of, or consent from Debtor. Debtor hereby (a) consents to such assignment or participation and agrees not to assert against Lender or any such assignee or participant any claims, counterclaims, claims in recoupment, abatement, reduction, defenses, or set-offs for breach of warranty or for any other reason which Debtor could assert against Lender, any such assignee or participant or the manufacturer of the Equipment, except defenses which cannot be waived under the Uniform Commercial Code; and (b) agrees to make and/or settle any and all claims with regard to the Equipment directly and exclusively against and with the manufacturer. Debtor agrees that no assignee or participant will have any obligations or liabilities under this Agreement to Debtor or to any other person by reason of any assignment or participation. Debtor hereby waives any right of set-off Debtor may now or hereafter have against Lender or any assignee of or participant in this Agreement. Upon Lender's assignment of Lender's entire interest in this Agreement, Lender shall be relieved, from and after the date of such assignment, of any liability for the performance of any obligation of Lender contained in this Agreement or any document executed in conjunction with this Agreement.

**7.3** **General.** (a) Waiver of any default shall not be a waiver of any other default. (b) All of Lender's rights are cumulative and not alternative. (c) No waiver or change in this Agreement shall bind Lender unless in writing signed by one of its authorized representatives. (d) Any provision hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. (e) Debtor authorizes Lender to correct patent errors herein and to make changes to this Agreement or to any related schedule that benefit Debtor. In addition, if the funding amount Debtor requests Lender to disburse exceeds the principal portion of the Total Amount due to changes in calculation of taxes, configuration of the Equipment or other factors affecting the cost of the Equipment, and if such an increase is within the limits of Lender's credit approval, Debtor authorizes Lender, upon written notice to Debtor, to increase the principal portion of the Total Amount by not more than fifteen percent and adjust the Total Amount and the installment amounts payable under this Agreement or any related schedule accordingly. (f) Any captions to the provisions of this Agreement are for convenience only and do not limit or affect the application or interpretation of this Agreement. (g) All of the terms and provisions of this Agreement shall apply to and be binding upon Debtor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. (h) The acceptance by Lender of any remittance from a party other than Debtor shall in no way constitute Lender's consent to the transfer of any of the Equipment to such party. (i) Debtor represents and warrants that there is no material pending or threatened investigation by any governmental authority, litigation or other legal proceeding against or involving Debtor. (j) So long as any of the Liabilities remains unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of Debtor's financial statements within 30 days of the end of each of Debtor's fiscal quarters and within 90 days after the end of each of Debtor's fiscal years. Such financial statements shall be prepared in accordance with GAAP and on the same basis (reviewed, audited, etc.) as Debtor's financial statements are currently prepared unless advised by Lender otherwise, at which time Debtor will comply with Lender's request. Debtor represents and warrants that all financial statements delivered will present fairly the financial condition and results of operations and cash flows of the Debtor as of the dates thereof and for the periods then ended. (k) Lender may pay fees to or receive fees from the seller or manufacturer of the Equipment, a broker, or other third party in connection with this Agreement. Such fees may affect the rate, terms and Debtor's total cost hereunder. (l) Debtor hereby agrees to indemnify, defend and hold harmless Lender and its Affiliates and respective principals, directors, officers, employees, representatives, agents and third-party advisors from and against any and all losses, disputes, claims, expenses (including, without limitation, legal expenses), damages and liabilities of whatsoever kind and nature arising out of, in connection with, or relating to the Equipment, this Agreement or any other document related hereto. If allowed by law, the legal expenses shall include the amount of any flat fee, retainer, contingent fee or the hourly charges of any attorney retained by Lender in enforcing any of Lender's rights hereunder or in the prosecution or defense of any litigation related to this Agreement or the transactions contemplated by this Agreement. This indemnification shall survive the termination or expiration of this Agreement.

**7.4** **Additional Covenants and Oral Agreement.** THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**7.5** **Waiver of Trial By Jury.** LENDER AND DEBTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT. LENDER AND DEBTOR HEREBY, FOR THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, WAIVE ANY RIGHT TO SUE FOR OR COLLECT FROM THE OTHER PARTY ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER AS A RESULT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ENFORCEMENT BY EITHER PARTY OF ITS RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT THAT ANY SUCH DAMAGES ARE PROVEN TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY.

**7.6** **Governing Law/Choice of Venue.** Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Illinois and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Illinois (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in Cook County, Illinois, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, however, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction. Lender and Debtor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

**7.7** **Execution and Transmission of Documentation.** This Agreement and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) we, Lender, will deliver to you, Debtor, an electronic or paper version of each Instrument; (ii) you will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by us in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to us by electronic, facsimile or other means; (iii) we will sign (electronically, digitally or manually, at our option) each signature page (if the Instrument requires our signature); and (iv) we will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. You agree that we may convert any Instrument you sign manually into an electronic record and store it in a document management system designated by us, and you hereby agree to adopt the electronic image of your manual signature as your valid and binding electronic signature. You hereby represent and warrant that you have not modified the Instrument sent to you for signature. Upon your one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, we will make the same available to you by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by you, and we may (at our option) retain only a copy of such Instrument and dispose of the version containing your manual signature. We both intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. You agree not to raise as a defense to the enforcement of any Instrument that you executed such Instrument by electronic or digital means or used electronic or other means to transmit your signature on such Instrument. Notwithstanding anything to the contrary herein, we reserve the right to require you to sign any Instrument manually and to deliver to us an original of such Instrument containing your manual signature.

Page 4 of 5 of Loan and Security Agreement dated MARCH 10, 2022 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.15T 12/2020
Doc Request :    78001
PRICINGENGINE 3078502

ORIGINAL FOR BMO HARRIS BANK

## IMPORTANT INFORMATION ABOUT ESTABLISHING A RELATIONSHIP WITH BANK

To help the United States Government fight terrorism and money laundering, Federal law requires us to obtain, verify, and record information that identifies each person or business that opens an account or establishes a relationship. What this means for you: when you open an account or establish a relationship, we will ask for your name, street address, date of birth, and identification number, such as a social security number or taxpayer identification number. For businesses, we will ask for the business name, street address and tax identification number. Federal law requires us to obtain this information. We may also ask to see your driver's license or other identifying documents that will allow us to identify you. We appreciate your cooperation.

## DELIVERY AND ACCEPTANCE OF EQUIPMENT

(Check Appropriate Box)

Debtor's obligations and liabilities to Lender are absolute and unconditional under all circumstances and regardless of any failure of operation or Debtor's loss of possession of any item of Equipment or the cessation or interruption of Debtor's business for any reason whatsoever.

☒ On **MARCH 10, 2022**, the Equipment being purchased with the proceeds of this Agreement was delivered to Debtor with all installation and other work necessary for the proper use of the Equipment completed at a location agreed upon by Debtor; the Equipment was inspected by Debtor and found to be in satisfactory condition in all respects and delivery was unconditionally accepted by Debtor.

☐ The Equipment being purchased with the proceeds of this Agreement has not yet been delivered to or accepted by Debtor and, upon delivery, Debtor agrees to execute such delivery and acceptance certificate as Secured Party requires.

☐ All of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.

Dated:  **MARCH 10, 2022**

Debtor(s) hereby acknowledge(s) receipt of an exact copy of this contract.

Lender:  **BMO HARRIS BANK N.A.**

Debtor:  **ROYAL ROAD LINE INC**

By:  _____

Name:  _____

Title:  **AUTHORIZED SIGNER**

300 E. JOHN CARPENTER FREEWAY
(Street Address)
IRVING, TEXAS 75062-2712
(City, State and Zip Code)

By:  _____

Name: **NISHAN SINGH**

Title:  **PRESIDENT**

State of Organization:  **CA**

Principal Residence/Chief Executive Office/Place of Business:
**5490 N SALINAS AVE APT 116**
(Street Address)
**FRESNO, CA 93722**
(City, State and Zip Code)

Billing/Invoice Address:

5490 N Salinas Ave APT 118
(Address)
Fresno CA 93722
(City, County, State and Zip Code)

When not in use, the Equipment will be kept at:

**5490 N SALINAS AVE APT 116**
(Equipment Street)
**FRESNO, CA 93722**
(Equipment City, County, State, and Zip)

Page 5 of 5 of Loan and Security Agreement dated MARCH 10, 2022 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 • Fund off fax
1.15T  12/2020
Doc Request :  78001
PRICINGENGINE 3070502

ORIGINAL FOR BMO HARRIS BANK

# Exhibit  3

**BMO**  Transportation Finance          **LOAN AND SECURITY AGREEMENT**

The undersigned debtor, meaning all debtors jointly and severally ("Debtor"), to secure the obligations set forth herein grants to the Lender named below (with its successors and assigns, "Lender") under the terms and provisions of this agreement (this "Agreement") a security interest in the following property (with all present and future attachments, accessions, accessories, replacement parts, repairs and additions or substitutions, "Equipment"):

| Year | Manufacturer | Model | Description | Serial Number |
|------|-------------|-------|-------------|---------------|
| 2024 | PETERBILT | 579 | 579 | 1XPBD49X3RD639014 |

## PAYMENT SCHEDULE

Debtor promises to pay Lender principal plus pre-computed interest and any administrative fee set forth below (the "Total Amount") of $249,931.20 in 60 installments as follows:

(a) $4,165.52 on APRIL 7, 2023 and a like sum on the like date of each month thereafter until fully paid;

(b) In irregular installments as follows:

# of Payments      Payment Amount      Payment Date

provided, however, that the final installment shall be in the amount of the then remaining unpaid balance plus any and all other accrued and unpaid sums due hereunder.

The interest under this Agreement is pre-computed. The Total Amount is calculated based on interest accruing at an interest rate of 9.70% per annum based on a 360-day year of twelve 30-day months, plus the administrative fee, if any, spread over the life of the loan. The total cost of credit includes such accrued interest and the administrative fee of $350.00 equating to an annual percentage rate of 9.76% based on a 360-day year of twelve 30-day months. Late payments may affect the actual total amount payable due to payment of delinquency charges and/or increased accrued interest. If the Payment Schedule contains (i) a period of longer than a month before the first Payment Date (the excess number of days herein referred to as a "Stub Period") or (ii) any month or months in which a Payment Amount is either not due or is in an amount less than the accrued interest for such month (in either event, such period herein referred to as a "Skip Period"), then at the option of Lender, to the extent permitted by law, the unpaid and accrued interest for such Stub Period or Skip Period may be added to the unpaid principal amount hereunder and shall thereafter accrue interest at the interest rate set forth above.

DELINQUENCY: FOR EACH INSTALLMENT NOT PAID WHEN DUE, DEBTOR AGREES TO PAY LENDER A DELINQUENCY CHARGE CALCULATED ON THE AMOUNT OF SUCH INSTALLMENT AT THE RATE OF 5% OF SUCH INSTALLMENT IF NOT PROHIBITED BY LAW, OTHERWISE AT THE HIGHEST RATE THAT DEBTOR CAN LEGALLY OBLIGATE ITSELF TO PAY AND/OR LENDER CAN LEGALLY COLLECT.

## USE OF PROCEEDS

Lender is hereby irrevocably authorized and directed to disburse the proceeds of this Agreement as follows:

| Amount | Payee (Name and Address) |
|--------|--------------------------|
| $197,144.50 | GREAT DANE OF UTAH INC |
| | 770 W 2100 S |
| | SALT LAKE CITY, UT 84119 |

Disbursement may be made in Lender's name on Debtor's behalf or in Debtor's name. Disbursement in accordance with the above instructions or any written supplement to these instructions will constitute payment and delivery to and receipt by Debtor of all such proceeds.

PAYMENT ADDRESS: All amounts payable under this Agreement are payable at Lender's address shown below or at such other address as Lender may specify from time to time in writing. All written communication concerning disputed amounts, including any check or other payment instrument that (i) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (ii) is tendered with other conditions or limitations (collectively a "Disputed Payment") must be mailed or delivered to us at the address for billing inquiries shown on the invoice or statement and not to the payment address.

## 1.0    THE EQUIPMENT

1.1      Disclaimer. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE QUALITY, WORKMANSHIP, DESIGN, MERCHANTABILITY, SUITABILITY, OR FITNESS OF THE EQUIPMENT FOR ANY PARTICULAR PURPOSE, OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED. Debtor's obligations hereunder are absolute and unconditional notwithstanding the existence, location or condition of any item of Equipment or its suitability for use in Debtor's business.

1.2      Equipment Receipt and Use. Debtor warrants and agrees that: the proceeds of the loan and the Equipment will be used solely for business and commercial purposes; the Equipment is free from and will be kept free from all liens, claims, security interests and encumbrances other than that created hereby; Debtor will not, without Lender's prior written consent, sell, rent, lend, encumber, pledge, transfer, secrete or otherwise dispose of any of the Equipment, nor will Debtor permit any such act; the Equipment will be maintained in good operating condition, repair and appearance, and will be used and operated with care, only by qualified personnel in the regular course of Debtor's business; the Equipment shall remain personal property and not become part of any real property regardless of the manner of affixation; Lender may inspect the Equipment and all books and records relating to the Equipment or Debtor's performance under this Agreement at all reasonable times and from time to time; the Equipment will be kept at Debtor's place of business which is indicated immediately below Debtor's signature and will not be removed from said location without the prior written consent of Lender, except that an item of Equipment may be used away from said location in the regular course of Debtor's business provided that (a) such item is not removed from the United States (except for occasional use in Canada), and (b) if such item is not returned to said location within 30 days. Debtor will immediately upon Lender's request and each 30 days thereafter until the item is returned report the then current location thereof to Lender in writing.

1.3      Insurance. Debtor shall at all times bear all risk of loss of, damage to or destruction of the Equipment, and shall notify Lender if any of the Equipment is lost, damaged or destroyed. Debtor agrees to maintain insurance on the Equipment for the actual cash value thereof and for the life of this Agreement, covering all risks of physical loss or damage and such other risks as Lender may require, in form and amount and with insurers chosen by Debtor and satisfactory to Lender. Debtor agrees to deliver promptly to Lender certificates or, if requested, policies of insurance satisfactory to Lender, each with a standard long-form loss-payable endorsement naming Lender, its agent or such other party as Lender may from time to time instruct, and its successors and assigns, as loss-payee as their interests may appear. Each policy shall provide that Lender's interest therein will not be invalidated by the acts, omissions or neglect of anyone other than Lender, and shall provide that coverage may not be canceled or altered by the insurer except upon 30 days prior written notice to Lender. Lender's acceptance of policies in lesser amounts or risks will not be a waiver of Debtor's foregoing obligation. Debtor assigns to Lender all proceeds of any physical damage insurance maintained by Debtor with respect to the Equipment and any and all returned premiums, up to the amount owing hereunder by Debtor. Debtor directs all insurers to pay such proceeds

Page 1 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.16T 03/2022
Doc Request :        8001
PRICINGENGINE 3203382                                     ORIGINAL FOR BMO HARRIS BANK

Created with Scanner Pro

directly to Lender and authorizes Lender to endorse Debtor's name to all remittances without the joinder of Debtor.

1.4     **Compliance With Law.** Debtor shall comply with all laws, rules and regulations applicable to Debtor and/or the operation of the Equipment, including without limitation, the USA PATRIOT Act and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing.

**2.0     SECURITY INTEREST**

2.1     **Security Interest.** Debtor hereby grants to Lender a first priority security interest in the Equipment to secure (a) payment of the Total Amount and all other obligations of Debtor to Lender under this Agreement, (b) the payment and performance of all other debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to Lender, whether under this Agreement or any other agreement, and (c) the payment and performance of all debts, liabilities and obligations of Debtor of every kind and character, whether now existing or hereafter arising, to each of Lender's Affiliates ("Liabilities"). For the purposes of this Agreement, an "Affiliate" of any party means and includes any direct or indirect parent, subsidiary or sister entity of that party and any successor or assign of any of them. Any sums at any time owing to Debtor and in the possession of Lender or any such Affiliate shall secure the Liabilities of Debtor to Lender and any Affiliate of Lender. Upon any assignment of this Agreement by Lender, the security interests granted herein will be assigned to and inure to the benefit of such assignee and the Affiliates of such assignee. The security interests granted herein shall continue to be effective regardless of any retaking or redelivery of the Equipment to Debtor.

2.2     **Perfection and Preservation of Security Interest.** Debtor agrees, at its own cost and expense: to do everything necessary or desirable to perfect and preserve the security interests granted hereunder; to extinguish or defend any action, proceeding or claim affecting the Equipment; and to pay promptly any taxes, assessments, license fees and other public or private charges when levied or assessed against the Equipment or this Agreement. Debtor authorizes Lender or any officer, employee or designee of Lender to file a financing statement describing the Equipment for itself and as representative of its Affiliates. Debtor agrees to execute and deliver to Lender, upon Lender's request, such documents, records and assurances as Lender deems necessary or advisable to confirm or perfect the security interest in the Equipment and Lender's rights hereunder.

2.3     **Location of Debtor.** (i) If Debtor is a registered organization, its state of organization is in the state set forth immediately below its signature on the last page of this Agreement and Debtor agrees that it will not change its form or state of organization without 30 days prior written notice to Lender. (ii) If Debtor is an individual, his/her principal place of residence is at the address set forth immediately below his/her signature on the last page of this Agreement and, if Debtor changes Debtor's principal residence, Debtor will notify Lender in writing of a change in his/her principal place of residence within 30 days of such change. Debtor agrees to reimburse Lender for all costs incurred by Lender related to any such change.

**3.0     ACCOUNT MANAGEMENT AND PAYMENT PROCESSING**

3.1     **Application of Payments.** All payments made by Debtor to Lender pursuant to this Agreement may be applied by Lender, in its sole and absolute discretion, to delinquency charges, interest and other such charges due hereunder, to principal due hereunder, and to any other Liabilities due hereunder or under any other agreement, in any order and manner selected by Lender. Debtor waives any right it may have to direct the application of any payments made by it to Lender, and Lender may at its option offset and deduct any liability or obligation of Debtor from any or all sums owed by it to Debtor.

3.2     **Debit Transactions.** Lender may but shall not be required to offer Debtor the option of paying any of Debtor's obligations to Lender through printed or electronic checks, drafts or charges ("Debit Transactions"). Each such Debit Transaction may be orally authorized by Debtor, any representative or officer of Debtor or any other party having access to or control of the account upon which the Debit Transaction is to be charged. Debtor authorizes Lender or any officer, employee or designee of Lender to initiate Debit Transactions from Debtor's account in the orally authorized amount plus Lender's then Debit Transaction Fee. This authorization may be canceled at any time by Debtor giving at least three business days' prior written notice to Debtor's bank and Lender. Debtor authorizes Lender to substitute a Debit Transaction for any check or other remittance submitted by Debtor in the amount of that remittance. Payment by Debit Transactions is not required by Lender nor is its use a factor in the approval of credit.

3.3     **Acceptable Forms of Payment/Payment Processing.** Credit to Debtor's account may be delayed if payment is (a) not received at the address indicated on the related invoice or (b) not accompanied by Debtor's invoice number. Preferred forms of payment include direct debit, wires, company checks and certified checks. Payment in any other form may delay processing or be returned to Debtor. Delayed credit may cause Debtor to incur a late payment fee. All credit for payments of Debtor's account is subject to final payment by the institution on which the item of payment was drawn. Debtor hereby agrees that any payment, other than a Disputed Payment, made by Debtor by remittance and received by Lender at an address other than the address specified on the related invoice may be replaced, at Lender's option, by Lender with a substitute written or electronic instrument of equal amount and presented to Debtor's financial institution for payment from the account referenced on the remittance from Debtor.

3.4     **Returned Payments.** If a check, draft or other remittance sent by Debtor or a Debit Transaction authorized by Debtor is returned unpaid or rejected for any reason other than the lack of a proper endorsement by Lender, the application of such payment to Debtor's Liabilities will be reversed and Debtor shall immediately pay Lender the amount of such returned payment, plus any delinquency charge accruing as the result of such reversal. Debtor shall further pay Lender any amount charged to Lender by any depositary institution because of such return and an additional handling charge in the amount of $25, or if applicable law limits or restricts the amount of such reimbursement and/or handling charge, the amounts chargeable under this provision will be limited and/or restricted in accordance with applicable law.

3.5     **Authorization to Share Information.** Lender may receive from and disclose to any individual, corporation, business trust, association, company, partnership, joint venture, or other entity (collectively, the "Entity"), including, without limiting the generality of the foregoing, any Affiliate of Lender and any credit reporting agency or other entity whether or not related to Lender for any purpose, information about Debtor, Debtor's accounts, credit application and credit experience with Lender and Debtor authorizes any Entity to release to Lender or any Affiliate of Lender any information related to Debtor, Debtor's accounts, credit experience and account information regarding Debtor. This shall be continuing authorization for all present and future disclosures of such information made by Lender, or any Entity requested to release such information to Lender.

3.6     **Maximum Interest Rate.** The parties hereto intend to comply with any applicable usury laws. Accordingly, they agree that, any provisions in this Agreement or any other agreement, document or communication to the contrary notwithstanding, this Agreement shall in no event require the payment or permit the collection of interest or any amount in the nature of interest or fees (collectively "Interest Amount") in excess of the maximum amount permitted by applicable law as now or hereafter construed by a court of competent jurisdiction. If any such excess Interest Amount is contracted for, charged or received pursuant to this Agreement, or if all of the principal balance under this Agreement shall be prepaid, or if the maturity of any amount under this Agreement is accelerated, so that under any of such circumstances or any other circumstance whatsoever the Interest Amount contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law as so construed, then in such event: (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction. Without limiting the foregoing, all calculations of the interest rate (taking into account all Interest Amounts) contracted for, charged or received with respect to this Agreement which are made for the purpose of determining whether such rate exceeds the maximum lawful rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all Interest Amounts at any time contracted for, charged to or received from Debtor in connection with such indebtedness.

**4.0     PERFORMANCE BY LENDER**

4.1     **Performance.** If Debtor fails to perform any of its obligations hereunder, Lender may, but shall not be obligated to, perform the same for the account of Debtor to protect the interest of Lender or Debtor or both, at Lender's option. Debtor shall immediately repay to Lender any amounts paid by Lender together with interest thereon at the rate payable upon acceleration of Debtor's obligations under this Agreement. Performance by Lender will not constitute a waiver of any default

Page 2 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off tax
1.16T 03/2022
Doc Request :         3001
PRICINGENGINE 3203352                                                    ORIGINAL FOR BMO HARRIS BANK

Created with Scanner Pro

by Debtor.

**4.2    Power of Attorney.** DEBTOR HEREBY APPOINTS LENDER OR ANY OFFICER, EMPLOYEE OR DESIGNEE OF LENDER AS DEBTOR'S ATTORNEY-IN FACT TO, IN DEBTOR'S OR LENDER'S NAME: (a) PREPARE, EXECUTE AND SUBMIT ANY NOTICE OR PROOF OF LOSS IN ORDER TO REALIZE THE BENEFITS OF ANY INSURANCE POLICY INSURING THE EQUIPMENT; (b) PREPARE, EXECUTE AND FILE ANY AGREEMENT, DOCUMENT, FINANCING STATEMENT, TITLE APPLICATION, INSTRUMENT (OR ANY OTHER WRITING OR RECORD) THAT, IN LENDER'S OPINION, IS NECESSARY TO PERFECT AND/OR GIVE PUBLIC NOTICE OF THE INTERESTS OF LENDER IN ANY EQUIPMENT; AND (c) ENDORSE DEBTOR'S NAME ON ANY REMITTANCE REPRESENTING PROCEEDS OF ANY INSURANCE RELATING TO THE EQUIPMENT OR THE PROCEEDS OF THE SALE, LEASE OR OTHER DISPOSITION OF THE EQUIPMENT (WHETHER OR NOT THE SAME IS A DEFAULT HEREUNDER). This power is coupled with an interest and is irrevocable as long as any Liabilities remain unpaid.

**5.0    DEFAULT AND REMEDIES**

**5.1    Events of Default.** Time is of the essence. An event of default shall occur if: (a) Debtor fails to pay when due any amount owed by it to Lender or any Affiliate of Lender under this Agreement; (b) Debtor or a Guarantor fails to pay any Liabilities when due to Lender or any Affiliate of Lender or is otherwise in default under any other document, agreement or instrument; (c) Debtor or a Guarantor defaults under the terms of any secured indebtedness or indebtedness of a material amount to any other party; (d) Debtor or a Guarantor fails to perform or observe any other term or provision to be performed or observed by it hereunder or under any other instrument or agreement furnished by Debtor or a Guarantor to, or otherwise acquired by, Lender or any Affiliate of Lender; (e) (i) Debtor or a Guarantor becomes insolvent, ceases to do business as a going concern, makes an assignment for the benefit of creditors, or takes advantage of any law for the relief of debtors, or (ii) a petition in bankruptcy or for an arrangement, reorganization, or similar relief is filed by or against Debtor or a Guarantor, or (iii) any property of Debtor or a Guarantor is attached, or a trustee or receiver is appointed for Debtor or a Guarantor or for substantial part of its property, or Debtor or a Guarantor applies for such appointment; (f) any of the Equipment is lost or destroyed; (g) there shall occur an appropriation, confiscation, retention, or seizure of control, custody or possession of any Equipment by any governmental authority, governmental agency or instrumentality (such entities, agencies and instrumentalities, collectively, "Governmental Authority"); (h) Debtor or anyone in the control, custody or possession of any Equipment is accused, alleged or charged by any Governmental Authority to have used any Equipment in connection with the commission or any crime (other than a misdemeanor moving violation); (i) there shall be a material adverse change in any of the (A) condition (financial or otherwise), business performance, prospects, operations or properties of Debtor or a Guarantor, (B) legality, validity or enforceability of this Agreement (C) perfection or priority of the Lien granted in favor of Lender pursuant to this Agreement, or (D) ability of the Debtor to repay the indebtedness or perform its obligations under this Agreement; (j) rights and remedies of Lender under this Agreement are impaired; (k) there shall be a death of majority owner of Debtor or a Guarantor, or there shall be a death of the Debtor or a Guarantor, if an individual; (l) there shall be any lien, claim or encumbrance on any of the Equipment except in favor of Lender or as otherwise granted herein; (m) there is a material change in the management, ownership or control of Debtor or any Guarantor, unless Lender has provided its prior written consent thereto; or (n) Debtor or any Guarantor is convicted of any felony offense, whether or not related to the Equipment.

**5.2    Remedies.** Upon the occurrence of an event of default, and at any time thereafter as long as the default continues, Lender may, at its option, with or without notice to Debtor (i) declare this Agreement to be in default, (ii) declare the indebtedness hereunder to be immediately due and payable, (iii) declare all other debts then owing by Debtor to Lender to be immediately due and payable, and (iv) exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and any other applicable laws, including the right to require Debtor to assemble the Equipment and deliver it to Lender at a place to be designated by Lender and to enter any premises where the Equipment may be without judicial process and take possession thereof. Any property other than Equipment that is in or upon the Equipment at the time of repossession may be taken and held without liability. Any requirement that Lender give reasonable notice regarding the sale or other disposition of Equipment will be met if such notice is mailed to Debtor at its last known address at least ten days before such sale or other disposition. Lender may dispose of any Equipment at a public or private sale or at auction. Lender may buy at any sale and become the owner of the Equipment. Debtor agrees that Lender may bring legal proceedings to enforce the payment and performance of Debtor's obligations hereunder in any court in the State shown in Lender's address set forth herein, and service of process may be made upon Debtor by mailing a copy of the summons to Debtor at its address shown herein. Debtor shall also pay to Lender all expenses of retaking, holding, preparing for sale, selling and the like, including without limitation (a) the reasonable fees of any attorneys retained by Lender, and (b) all other legal expenses incurred by Lender. Debtor agrees that Debtor is liable for any deficiency remaining after any disposition of Equipment after default. Lender may sell the Equipment without giving any warranties as to the Equipment. Lender may disclaim any warranties of title, possession, quiet enjoyment, or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Equipment.

**5.3    Acceleration Interest.** Debtor agrees to pay Lender, upon acceleration of the above indebtedness, interest on all sums then owing hereunder at the rate of 1 1/2% per month if not prohibited by law, otherwise at the highest rate Debtor can legally obligate itself to pay or Lender can legally collect under applicable law.

**6.0    PREPAYMENT**

**6.1    Partial Prepayment and Reschedule.** (a) Debtor does not have the right to prepay only a portion of the balance of this Agreement prior to maturity. (b) If there are several units subject to this Agreement and Lender either (i) requires (as a result of a casualty loss) or (ii) permits all indebtedness that relates to a specific unit to be paid in full, Lender will apply the proceeds identified as relating thereto to the balance due under this Agreement and reschedule the remaining indebtedness under this Agreement over the then remaining term in accordance with the provisions set forth below. (c) If Lender receives one or more remittance(s) in an aggregate amount in excess of the amounts then due and unpaid under this Agreement (other than any amounts paid pursuant to 6.1(b) above) ("Excess Remittances") Lender may, at its option: (i) apply any portion of such Excess Remittances (A) in payment of obligations then due or past due under any other agreement Debtor has with Lender, (B) to the balance due under this Agreement in any manner selected by Lender, with or without rescheduling the remaining indebtedness over the then remaining term; or (ii) return such excess amount to Debtor at its last known address. (d) The interest included in this Agreement is precomputed and accrues in arrears; accordingly, early payment of one or more installments prior to their maturity date may not reduce the total interest payable by Debtor under this Agreement unless Lender reschedules the remaining payments. If Lender reschedules the indebtedness under this Agreement, Lender will deduct the unaccrued portion of interest on the unpaid balance under this Agreement at the time of reschedule (which the parties agree shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Reschedule Date")) calculated using any method selected by Lender as permitted by applicable law, and recalculate precomputed interest on such unpaid balance as of the Effective Reschedule Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Reschedule Date. (e) If Lender requires (as a result of a casualty loss) or permits Debtor to make a partial prepayment pursuant to clause (b) of this Section, Debtor agrees that it will at the time of such prepayment pay a prepayment fee equal to the pro rata portion of the prepayment fee that would have been paid pursuant to Section 6.2 below if Debtor had prepaid the indebtedness under this Agreement in full, computed based on the percentage of the outstanding Total Amount being prepaid (for purposes of calculating the outstanding Total Amount, no effect shall be given to any prior prepayments).

**6.2    Prepayment In Full.** Subject to the terms of this provision, Debtor may prepay the indebtedness under this Agreement in full (but not in part) at any time, so long as Debtor is not in default hereunder; provided, however, that any prepayment that is not paid on a scheduled payment due date shall be deemed to have been made and shall be effective as of the next scheduled due date (the "Effective Prepayment Date"). If Debtor makes a prepayment in full prior to the last twelve months of this Agreement (whether as a result of a casualty loss or otherwise), Lender accelerates the maturity of the indebtedness hereunder following a default, or a petition is filed by or against Debtor under any bankruptcy or insolvency law, Debtor must pay a prepayment fee equal to the lesser of (a) (x) 1% of the Total Amount outstanding as of the Effective Prepayment Date (for purposes of this calculation, no effect shall be given to any prior prepayments) multiplied by (y) the number of full twelve-month periods remaining until the originally scheduled or later extended due date of the final installment payable under this Agreement as of prepayment, and (b) the maximum prepayment and/or acquisition charge allowed by applicable law. Debtor and Lender acknowledge and agree that the prepayment fee is a reasonable estimate of the actual or anticipated harm sustained by Lender for Debtor's prepayment of the Total Amount. For purposes of calculating the prepayment amount and any prepayment fee, any unearned interest that would accrue after the Effective Prepayment Date shall be excluded from the calculation of the Total Amount outstanding as of the Effective Prepayment Date. Debtor will not receive any rebate of, or credit for, interest relating to any period prior to the Effective Prepayment Date. Debtor agrees that all accrued and unpaid late charges and other amounts due from Debtor under this Agreement will be paid concurrently with any such prepayment.

Page 3 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.16T 03/2022
Doc Request:        8001
PRICINGENGINE 3203382                        ORIGINAL FOR BMO HARRIS BANK

Created with Scanner Pro

**7.0 ASSIGNMENT AND GENERAL PROVISIONS**

**7.1 Chattel Paper.** The only copy of this Agreement that constitutes "Chattel Paper" for all purposes of the Uniform Commercial Code is the copy marked "ORIGINAL FOR BMO HARRIS BANK" which is delivered to and held by Lender.

**7.2 Assignment and Waiver.** This Agreement may not be assigned by Debtor without the prior written consent of Lender. Lender may sell, transfer or assign any or all rights under this Agreement or sell participations herein without notice to, acknowledgment of, or consent from Debtor. Debtor hereby (a) consents to such assignment or participation and agrees not to assert against Lender or any such assignee or participant any claims, counterclaims, claims in recoupment, abatement, reduction, defenses, or set-offs for breach of warranty or for any other reason which Debtor could assert against Lender, any such assignee or participant or the manufacturer of the Equipment, except defenses which cannot be waived under the Uniform Commercial Code; and (b) agrees to make and/or settle any and all claims with regard to the Equipment directly and exclusively against and with the manufacturer. Debtor agrees that no assignee or participant will have any obligations or liabilities under this Agreement to Debtor or to any other person by reason of any assignment or participation. Debtor hereby waives any right of set-off Debtor may now or hereafter have against Lender or any assignee of or participant in this Agreement. Upon Lender's assignment of Lender's entire interest in this Agreement, Lender shall be relieved, from and after the date of such assignment, of any liability for the performance of any obligation of Lender contained in this Agreement or any document executed in conjunction with this Agreement.

**7.3 General.** (a) Waiver of any default shall not be a waiver of any other default. (b) All of Lender's rights are cumulative and not alternative. (c) No waiver or change in this Agreement shall bind Lender unless in writing signed by one of its authorized representatives. (d) Any provision hereof contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. (e) Debtor authorizes Lender to correct patent errors herein and to make changes to this Agreement or to any related schedule that benefit Debtor. In addition, if the funding amount Debtor requests Lender to disburse exceeds the principal portion of the Total Amount due to changes in calculation of taxes, configuration of the Equipment or other factors affecting the cost of the Equipment, and if such an increase is within the limits of Lender's credit approval, Debtor authorizes Lender, upon written notice to Debtor, to increase the principal portion of the Total Amount by not more than fifteen percent and adjust the Total Amount and the installment amounts payable under this Agreement or any related schedule accordingly. (f) Any captions to the provisions of this Agreement are for convenience only and do not limit or affect the application or interpretation of this Agreement. (g) All of the terms and provisions of this Agreement shall apply to and be binding upon Debtor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Lender and its successors and assigns. (h) The acceptance by Lender of any remittance from a party other than Debtor shall in no way constitute Lender's consent to the transfer of any of the Equipment to such party. (i) Debtor represents and warrants that there is no material pending or threatened investigation by any governmental authority, litigation or other legal proceeding against or involving Debtor. (j) So long as any of the Liabilities remains unpaid or unperformed, Debtor will provide Lender with such financial information as Lender may reasonably request, including copies of Debtor's financial statements within 30 days of the end of each of Debtor's fiscal quarters and within 90 days after the end of each of Debtor's fiscal years. Such financial statements shall be prepared in accordance with GAAP and on the same basis (reviewed, audited, etc.) as Debtor's financial statements are currently prepared unless advised by Lender otherwise, at which time Debtor will comply with Lender's request. Debtor represents and warrants that all financial statements delivered will present fairly the financial condition and results of operations and cash flows of the Debtor as of the dates thereof and for the periods then ended. (k) Lender may pay fees to or receive fees from the seller or manufacturer of the Equipment, a broker, or other third party in connection with this Agreement. Such fees may affect the rate, terms and Debtor's total cost hereunder. (l) Debtor hereby agrees to indemnify, defend and hold harmless Lender and its Affiliates and respective principals, directors, officers, employees, representatives, agents and third-party advisors from and against any and all losses, disputes, claims, expenses (including, without limitation, legal expenses), damages and liabilities of whatsoever kind and nature arising out of, in connection with, or relating to the Equipment, this Agreement or any other document related hereto. If allowed by law, the legal expenses shall include the amount of any flat fee, retainer, contingent fee or the hourly charges of any attorney retained by Lender in enforcing any of Lender's rights hereunder or in the prosecution or defense of any litigation related to this Agreement or the transactions contemplated by this Agreement. This indemnification shall survive the termination or expiration of this Agreement. (m) If, at Debtor's request, Lender sends any certificate of title, instrument, document or agreement to Debtor or its designee by expedited delivery, Debtor agrees to pay Lender a special handling fee of $25 plus the actual cost of the expedited delivery service. (n) Consent to Telephone Calls and Monitoring. Debtor expressly agrees that Lender, its Affiliates, anyone to whom Lender sells or assigns any of Debtor's obligations hereunder, and any of their agents and representatives (collectively, the "Lender Parties"), may contact and communicate with Debtor and its officers, employees and agents (collectively, the "Debtor Parties") using automatic telephone dialing systems, artificial or prerecorded voice message systems and text messaging systems, in order to provide any Debtor Party with information or to seek information about, or to otherwise discuss (A) this Agreement and any transactions hereunder, or (B) any other agreements or transactions that any Debtor Party may now have or may in the future establish or conduct with any Lender Party. Debtor's authorization shall include without limitation contacts to discuss or obtain information about missed or late payments or other amounts any Debtor Party owes any Lender Party. Debtor authorizes the Lender Parties to make such contacts using any telephone numbers (including without limitation wireless, landline and VOIP numbers) that any Debtor Party has supplied or may in the future supply in connection with (i) this Agreement or the transactions hereunder, or (ii) any other agreement or transaction any Debtor Party may now have or may in the future establish or conduct with any Lender Party. Debtor acknowledges that anyone with access to a Debtor Party's telephone may listen to the voice messages a Lender Party leaves such Debtor Party or read the text messages a Lender Party sends such Debtor Party, and Debtor agrees that no Lender Party will have any liability for anyone accessing such messages. Debtor further acknowledges that, when a Debtor Party receives a telephone call or text message from a Lender Party, the Debtor Party may incur a charge from the company that provides it with telecommunications, wireless and/or data services, and Debtor agrees that no Lender Party will have any liability as a result of such charges. Debtor expressly authorizes the Lender Parties to monitor and record calls from any Debtor Party. Debtor represents that it is the owner and/or primary user of any number or email address provided to the Lender Parties, and agrees that it will notify Lender if this is no longer true as to any such number or email address. Debtor further acknowledges that its authorizations, representations and agreements in this paragraph were a material inducement to Lender entering into this Agreement.

**7.4 Additional Covenants and Oral Agreement.** THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**7.5 Waiver of Trial By Jury.** LENDER AND DEBTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS AGREEMENT. LENDER AND DEBTOR HEREBY, FOR THEMSELVES, THEIR SUCCESSORS AND ASSIGNS, WAIVE ANY RIGHT TO SUE FOR OR COLLECT FROM THE OTHER PARTY ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER AS A RESULT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE ENFORCEMENT BY EITHER PARTY OF ITS RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT THAT ANY SUCH DAMAGES ARE PROVEN TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY.

**7.6 Governing Law/Choice of Venue.** Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Illinois and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Illinois (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in Cook County, Illinois, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, however, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction. Lender and Debtor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

Page 4 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.16T 03/2022
Doc Request :        1001
PRICINGENGINE 3203382                                    ORIGINAL FOR BMO HARRIS BANK

**7.7     Execution and Transmission of Documentation.** This Agreement and any schedules, exhibits, annexes or related instruments (each an "**Instrument**") will be created and evidenced as follows: (i) we, Lender, will deliver to you, Debtor, an electronic or paper version of each Instrument; (ii) you will (A) print and sign (and initial where indicated), using ink on paper (a "manual" signature), or(B) if instructed or expressly permitted by us in writing, sign by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to us by electronic, facsimile or other means; (iii) we will sign (electronically, digitally or manually, at our option) each signature page (if the Instrument requires our signature); and (iv) we will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. You agree that we may convert any Instrument you sign manually into an electronic record and store it in a document management system designated by us, and you hereby agree to adopt the electronic image of your manual signature as your valid and binding electronic signature. You hereby represent and warrant that you have not modified the Instrument sent to you for signature. Upon your one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, we will make the same available to you by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by you, and we may (at our option) retain only a copy of such Instrument and dispose of the version containing your manual signature. We both intend that each Instrument produced by this process shall be for all purposes (including without limitation perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic Instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. You agree not to raise as a defense to the enforcement of any Instrument that you executed such Instrument by electronic or other means or used electronic or other means to transmit your signature on such Instrument. Notwithstanding anything to the contrary herein, we reserve the right to require you to sign any Instrument manually and to deliver to us an original of such Instrument containing your manual signature. Any Instrument may be executed in any number of counterparts and by different parties on separate counterparts and all of such counterparts shall together constitute one and the same Instrument.

[Remainder of Page Intentionally Left Blank]

Page 5 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off tax
1.16T 03/2022
Doc Request :          8001
PRICINGENGINE 3203352                                         ORIGINAL FOR BMO HARRIS BANK

## IMPORTANT INFORMATION ABOUT ESTABLISHING A RELATIONSHIP WITH BANK

To help the United States Government fight terrorism and money laundering, Federal law requires us to obtain, verify, and record information that identifies each person or business that opens an account or establishes a relationship. What this means for you: when you open an account or establish a relationship, we will ask for your name, street address, date of birth, and identification number, such as a social security number or taxpayer identification number. For businesses, we will ask for the business name, street address and tax identification number. Federal law requires us to obtain this information. We may also ask to see your driver's license or other identifying documents that will allow us to identify you. We appreciate your cooperation.

## DELIVERY AND ACCEPTANCE OF EQUIPMENT

(Check Appropriate Box)

Debtor's obligations and liabilities to Lender are absolute and unconditional under all circumstances and regardless of any failure of operation or Debtor's loss of possession of any item of Equipment or the cessation or interruption of Debtor's business for any reason whatsoever.

☒ On MARCH 7, 2023, the Equipment being purchased with the proceeds of this Agreement was delivered to Debtor with all installation and other work necessary for the proper use of the Equipment completed at a location agreed upon by Debtor; the Equipment was inspected by Debtor and found to be in satisfactory condition in all respects and delivery was unconditionally accepted by Debtor.

☐ The Equipment being purchased with the proceeds of this Agreement has not yet been delivered to or accepted by Debtor and, upon delivery, Debtor agrees to execute such delivery and acceptance certificate as Secured Party requires.

☐ All of the Equipment was acquired by Debtor prior to the date hereof and was previously delivered to and unconditionally accepted by Debtor.

Dated:   **MARCH 7, 2023**

Lender:   BMO HARRIS BANK N.A.

Debtor(s) hereby acknowledge(s) receipt of an exact copy of this contract.

Debtor:   **ROYAL ROAD LINE INC**

By: _____

Name: _April Robinson_

Title: **AUTHORIZED SIGNER**

300 E. JOHN CARPENTER FREEWAY
(Street Address)
IRVING, TEXAS 75062-2712
(City, State and Zip Code)

By: _NISHAN SINGH_

Name: **NISHAN SINGH**

Title: **PRESIDENT**

State of Organization:   **CA**

Principal Residence/Chief Executive Office/Place of Business:
5490 N SALINAS AVE APT 116
(Street Address)
**FRESNO, CA 93722**
(City, State and Zip Code)

Billing/Invoice Address:

_____
(Address)

_____
(City, County, State and Zip Code)

When not in use, the Equipment will be kept at:

5490 N SALINAS AVE APT 116
(Equipment Street)
**FRESNO, CA 93722**
(Equipment City, County, State, and Zip)

---

Page 6 of 6 of Loan and Security Agreement dated MARCH 7, 2023 between ROYAL ROAD LINE INC (Debtor) and BMO HARRIS BANK N.A. (Lender).
621700 - Fund off fax
1.16T 03/2022
Doc Request :        3001
PRICINGENGINE 3703382          ORIGINAL FOR BMO HARRIS BANK

Created with Scanner Pro

# Exhibit   4

**CONTINUING GUARANTY**

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to BMO **HARRIS BANK N.A.** and its affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "Bank") that **ROYAL ROAD LINE INC** (the Company), whose address is **5490 N SALINAS AVE APT 116, FRESNO, CA 93722** shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to Bank, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted with or otherwise acquired by Bank (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral therefor (collectively called "Security") or the pursuit by Bank of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by Bank by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring Bank to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy Bank may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death or dissolution of any Guarantor; the records of Bank shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of Bank, with or without joinder of the Company or any of the other Guarantors as parties thereto; and such Guarantor will not avail itself of any defense whatsoever which the Company may have against Bank, other than full payment of the Indebtedness.

Each Guarantor agrees to provide promptly to Bank such financial statements and other financial records and information respecting Guarantor as Bank may from time to time request. Each Guarantor authorizes Bank, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to Bank or otherwise obtained by Bank.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT BANK HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF BANK AGAINST THE COMPANY OR ANY SECURITY WHICH BANK NOW HAS OR HEREAFTER ACQUIRES, WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until that Guarantor deliver to Bank a written notice signed by them electing not to guarantee any new extension of credit that may be granted by Bank to the Company after its receipt of such notice, but such notice shall not affect the obligations of the Guarantors hereunder as to any and all Indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by Bank to the Company from time to time, (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to Bank by the Company, (iii) all exemptions and homestead laws; and (iv) any other demands and notices required by law. Bank may, at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder: (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security, (e) sell and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to Bank by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and Bank shall not be stopped from exercising any rights hereunder notwithstanding (i) Bank waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of Bank to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) Bank failure to take new, additional or substitute security or collateral for the Indebtedness.

This Guaranty shall be governed by and interpreted in accordance with the laws of the State of Illinois, without regard to its conflict of laws provisions, and each Guarantor submits to personal jurisdiction in the State of Illinois. Each Guarantor agrees that: Bank may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any jurisdiction or court where suit may be had with respect to any Agreement, the Security, or on the underlying Indebtedness; Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to Bank. All rights and remedies of Bank are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "Instrument") will be created and evidenced as follows: (i) Bank will deliver to Guarantors an electronic or paper version of each Instrument; (ii) each Guarantor will print and sign (and initial where indicated), using other ink on paper (a "manual" signature) or, if instructed or expressly permitted by Bank in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to Bank by electronic, facsimile or other means; (iii) Bank will sign (electronically, digitally or manually, at its option) each signature page (if the Instrument requires Bank's signature); and (iv) Bank will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor agrees that Bank may convert any Instrument signed manually into an electronic record and store it in a document management system designated by Bank, and each Guarantor hereby agrees to adopt the electronic image of its manual signature as its valid and binding electronic signature. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, Bank will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and Bank may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Each Guarantor agrees that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic Instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used electronic or other means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, Bank reserves the right to require Guarantors to sign any Instrument manually and to deliver to Bank an original of such Instrument containing Guarantors' manual signatures.

This Guaranty is subject to and governed by the laws of the State of Illinois (without regard to the conflicts of law principles of such State), regardless of the location of Guarantor or the Company.

GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION RELATING TO THIS GUARANTY.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) <u>OWNER</u> OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on <u>MARCH 7, 2023</u>.

Witness: _____  Guarantor: **NISHAN SINGH** _____ (L.S.)

Witness: _____  By: _N̲I̲S̲H̲A̲N̲ S̲I̲N̲G̲H̲_ Title: **INDIVIDUAL**

Address: **5675 N FRESNO ST # 113, FRESNO, CA 93710**

620861 - Fund off fax
1.9T 03/2022
Doc Request      38001                     1 of 1

## CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to BMO HARRIS BANK N.A. and its affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "Bank") that **ROYAL ROAD LINE INC** (the Company), whose address is **8490 N SALINAS AVE APT 116, FRESNO, CA 93722** shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to Bank, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted with or otherwise acquired by Bank (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectability. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or the pursuit by Bank of any rights or remedies which it now has or may hereafter have, if the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by Bank by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring Bank to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy Bank may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of Bank shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of Bank, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against Bank, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to Bank such financial statements and other financial records and information respecting Guarantor as Bank may from time to time request. Each Guarantor authorizes Bank, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to Bank or otherwise obtained by Bank.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT BANK HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF BANK AGAINST THE COMPANY OR ANY SECURITY WHICH BANK NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to Bank a written notice signed by them electing not to guarantee any new extension of credit that may be granted by Bank to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by Bank to the Company from time to time, (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to Bank by the Company, (iii) all exemptions and homestead laws, (iv) any other demands and notices required by law; and (v) any right to trial by jury. Bank may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder; (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness, (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security; (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to Bank by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and Bank shall not be stopped from exercising any rights hereunder, notwithstanding (i) Bank's waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of Bank to perfect any security interest in or foreclose, proceed against, or exhaust, any Security; or (iii) Bank's failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that Bank may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which Bank's office administering the Indebtedness is located, and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to Bank. All rights and remedies of Bank are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (such an "Instrument") will be created and evidenced as follows. (i) Bank will deliver to Guarantors an electronic or paper version of each Instrument, (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by Bank in writing, by electronic or digital means (an "electronic" signature), the signature page of each such Instrument and deliver the same to Bank by electronic, facsimile or other means, (iii) Bank will sign (electronically, digitally or manually, at its option) each signature page (if the Instrument requires Bank's signature), and (iv) Bank will attach each fully signed signature page to an electronic or printed paper copy of the applicable Instrument. Each Guarantor agrees that Bank may convert any Instrument signed manually into an electronic record and store it in a document management system designated by Bank, and each Guarantor hereby agrees to adopt the electronic image of its manual signature as its valid and binding electronic signature. Each Guarantor hereby represents and warrants that it has not modified the Instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed Instrument promptly after it has been produced by this process, Bank will make the same available to such Guarantor by electronic or other means. Each Instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and Bank may (at its option) retain only a copy of such Instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and Bank each intend that each Instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Instrument; and to the extent, if any, that any Instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic Instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such Instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the Instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any Instrument that it or any other Guarantor executed such Instrument by electronic or digital means or used electronic or other means to transmit its signature on such Instrument. Notwithstanding anything to the contrary herein, Bank reserves the right to require Guarantors to sign any Instrument manually and to deliver to Bank an original of such Instrument containing Guarantors' manual signatures.

This Guaranty is subject to and governed by the laws of the State of Illinois (without regard to the conflicts of law principles of such State), regardless of the location of Guarantor or the Company.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) OFFICER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on DECEMBER 30, 2021.

Witness: _____

Witness: _____

Guarantor: **NISHAN SINGH** _____ (L.S.)

By: _____ **NISHAN SAVU** Title: **INDIVIDUAL**

Address: **6675 N FRESNO ST # 113, FRESNO, CA 93710**

620861 - Fund off fax
1.8T 12/2020
Doc Request: 8001

1 of 1

# CONTINUING GUARANTY

For Valuable Consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, for themselves, their heirs, executors, personal representatives, successors and assigns (individually called "Guarantor" and collectively called "Guarantors") jointly and severally and in solido, hereby unconditionally guarantee to BMO HARRIS BANK N.A. and its affiliates, together with the respective successors, endorsees and assigns of each of the foregoing (collectively called "Bank") that ROYAL ROAD LINE INC (the Company), whose address is 5490 N SALINAS AVE APT 116, FRESNO, CA 93722 shall promptly and fully perform, pay and discharge all of its present and future liabilities, obligations and indebtedness to Bank, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or un-matured, and whether originally contracted with or otherwise acquired by Bank (all of which liabilities, obligations and indebtedness are herein individually and collectively called the "Indebtedness"). This Guaranty is an absolute and unconditional guarantee of payment and not of collectibility. The liability of each Guarantor hereunder is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments, agreements or chattel paper related thereto (collectively called "Agreements") or any security or collateral there for (collectively called "Security") or in pursuit by Bank of any rights or remedies which it now has or may hereafter have. If the Company fails to pay the Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under any of the Agreements, each Guarantor agrees to pay on demand the entire Indebtedness and all losses, costs, attorneys' fees and expenses which may be suffered by Bank by reason of the Company's default or the default of any Guarantor hereunder, and agrees to be bound by and to pay on demand any deficiency established by the sale of any of the Agreements or Security, all without relief from valuation and appraisement laws and without requiring Bank to (i) proceed against the Company by suit or otherwise, (ii) foreclose, proceed against, liquidate or exhaust any of the Agreements or Security, or (iii) exercise, pursue or enforce any right or remedy Bank may have against the Company, any co-Guarantor (whether hereunder or under a separate instrument) or any other party. Each Guarantor agrees that: this Guaranty shall not be discharged or affected by any circumstances which constitute a legal or equitable discharge of a Guarantor or surety, or by the death of any Guarantor; the records of Bank shall be received as conclusive evidence of the amount of the Indebtedness at any time owing; one or more successive or concurrent suits may be brought and maintained against any or all of the Guarantors, at the option of Bank, with or without joinder of the Company or any of the other Guarantors as parties thereto; such Guarantor will not avail itself of any defense whatsoever which the Company may have against Bank, other than full payment of the Indebtedness; and such Guarantor will not seek a change of venue from any jurisdiction or court in which any action, proceeding or litigation is commenced.

Each Guarantor agrees to provide promptly to Bank such financial statements and other financial records and information respecting Guarantor as Bank may from time to time request. Each Guarantor authorizes Bank, throughout the term of this Guaranty, to investigate or make inquiries of creditors or any other persons and credit bureaus regarding Guarantor (including equity holders of Guarantor), and provide to creditors or any other persons any financial, credit or other information regarding or relating to Guarantor, whether supplied by Guarantor to Bank or otherwise obtained by Bank.

EACH GUARANTOR HEREBY WAIVES NOTICE OF ANY ADVERSE CHANGE IN THE COMPANY'S CONDITION OR OF ANY OTHER FACT WHICH MIGHT MATERIALLY INCREASE SUCH GUARANTOR'S RISK, WHETHER OR NOT BANK HAS KNOWLEDGE OF THE SAME. EACH GUARANTOR ALSO HEREBY WAIVES ANY CLAIM, RIGHT OR REMEDY WHICH SUCH GUARANTOR MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST THE COMPANY THAT ARISES HEREUNDER AND/OR FROM THE PERFORMANCE BY ANY GUARANTOR HEREUNDER INCLUDING, WITHOUT LIMITATION, ANY CLAIM, REMEDY OR RIGHT OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION, INDEMNIFICATION, OR PARTICIPATION IN ANY CLAIM, RIGHT OR REMEDY OF BANK AGAINST THE COMPANY OR ANY SECURITY WHICH BANK NOW HAS OR HEREAFTER ACQUIRES; WHETHER OR NOT SUCH CLAIM, RIGHT OR REMEDY ARISES IN EQUITY, UNDER CONTRACT, BY STATUTE, UNDER COMMON LAW OR OTHERWISE.

No termination hereof shall be effective until the Guarantors deliver to Bank a written notice signed by them electing not to guarantee any new extension of credit that may be granted by Bank to the Company after its receipt of such notice, but such notice shall not affect the obligations of the guarantors hereunder as to any and all indebtedness existing at the time such notice is received or incurred by the Company within thirty (30) days thereafter. Each Guarantor hereby waives (i) notice of acceptance hereof and notice of extensions of credit given by Bank to the Company from time to time; (ii) presentment, demand, protest, and notice of non-payment or protest as to any note or other evidence of indebtedness signed, accepted, endorsed or assigned to Bank by the Company, (iii) all exemptions and homestead laws; (iv) any other demands and notices required by law; and (v) any right to trial by jury. Bank may at any time and from time to time, without notice to or the consent of any Guarantor, and without affecting or impairing the obligation of any Guarantor hereunder: (a) renew, extend or refinance any part or all of the Indebtedness of the Company or any Indebtedness of its customers, or of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (b) accept partial payments of the Indebtedness and apply such payments to any part of the Indebtedness; (c) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate, in any manner, any of the Indebtedness, any Security, or any Indebtedness of any co-Guarantor (whether hereunder or under a separate instrument) or any other party; (d) consent to the transfer of any Security, (e) bid and purchase at any sale of any of the Agreements or Security; and (f) exercise any and all rights and remedies available to Bank by law or agreement even if the exercise thereof may affect, modify or eliminate any rights or remedies which a Guarantor may have against the Company. Each Guarantor shall continue to be liable under this Guaranty, the provisions hereof shall remain in full force and effect, and Bank shall not be stopped from exercising any rights hereunder, notwithstanding (i) Bank waiver of or failure to enforce any of the terms, covenants or conditions contained in any of the Agreements; (ii) any release of, or failure on the part of Bank to perfect any security interest in or foreclose, proceed against, or exhaust any Security; or (iii) Bank failure to take new, additional or substitute security or collateral for the Indebtedness.

Each Guarantor agrees that Bank may bring any legal proceedings it deems necessary to enforce any or all of such Guarantor's obligations hereunder in any court in the State in which Bank's office administering the Indebtedness is located; and service of process may be made upon such Guarantor by mailing a copy of the summons to such Guarantor at its address last known to Bank. All rights and remedies of Bank are cumulative and not alternative. Each provision of this Guaranty is intended to be severable. Any term or provision hereof declared to be contrary to, prohibited by or invalid under applicable laws or regulations shall be inapplicable and deemed omitted here from, but shall not invalidate the remaining terms and provisions hereof.

Execution and Transmission of Documentation. This Guaranty and any schedules, exhibits, annexes or related instruments (each an "instrument") will be created and evidenced as follows: (i) Bank will deliver to Guarantors an electronic or paper version of each instrument; (ii) each Guarantor will print and sign (and initial where indicated), using either ink on paper (a "manual" signature) or, if instructed or expressly permitted by Bank in writing, by electronic or digital means (an "electronic" signature), the signature page of each such instrument and deliver the same to Bank by electronic, facsimile or other means; (iii) Bank will sign (electronically, digitally or manually, at its option) each signature page (if the instrument requires Bank's signature); and (iv) Bank will attach each fully signed signature page to an electronic or printed paper copy of the applicable instrument. Each Guarantor agrees that Bank may convert any instrument signed manually into an electronic record and store it in a document management system designated by Bank, and each Guarantor hereby agrees to adopt the electronic image of its manual signature as its valid and binding electronic signature. Each Guarantor hereby represents and warrants that it has not modified the instrument sent to it for signature. Upon a Guarantor's one-time request for a copy of any fully signed instrument promptly after it has been produced by this process, Bank will make the same available to such Guarantor by electronic or other means. Each instrument produced by this process will be conclusively presumed to be identical to the version signed or initialed by Guarantors, and Bank may (at its option) retain only a copy of such instrument and dispose of the version containing Guarantors' manual signatures. Guarantors and Bank each intend that each instrument produced by this process shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated instrument; and to the extent, if any, that any instrument constitutes chattel paper (as the term is defined in the applicable Uniform Commercial Code), the resulting electronic instrument shall be the single authoritative copy (as that term is used in the applicable Uniform Commercial Code) and no security interest in such instrument may be created through the transfer or possession of any counterpart or copy thereof, other than the instrument produced by this process. Each Guarantor agrees not to raise as a defense to the enforcement of any instrument that it or any other Guarantor executed such instrument by electronic or digital means or used electronic or other means to transmit its signature on such instrument. Notwithstanding anything to the contrary herein, Bank reserves the right to require Guarantors to sign any instrument manually and to deliver to Bank an original of such instrument containing Guarantors' manual signatures.

This Guaranty is subject to and governed by the laws of the State of Illinois (without regard to the conflicts of law principles of such State), regardless of the location of Guarantor or the Company.

GUARANTOR REPRESENTS THAT GUARANTOR IS A(N) MEMBER OF OR IN THE COMPANY.

IN WITNESS WHEREOF, the Guarantors have executed this Guaranty on MARCH 10, 2022.

| | |
|---|---|
| Witness: *Varinder Singh* | Guarantor: NISHAN SINGH                                (L.S.) |
| Witness: *Avtcan Singh* | By: *Nishan Singh*  Title:  INDIVIDUAL |
| | Address: 5490 SALINAS AVE. APT 116, FRESNO, CA 93722 |

# Exhibit  5

# New Title



**Title Number:** UT009240622

**Vehicle Type:** Truck    **Year:** 2024    **Make:** PTRB    **Model:** 579 TRACTOR    **Body Style:** Tractor

**VIN/HIN:** 1XPBD49X3RD639014

**Cylinders:** 6    **Fuel:** Diesel    **Odometer:** 0    **Date Issued:** 03/20/2023

BMO HARRIS BANK N.A.
PO BOX 35707
BILLINGS MT  59107-5707

**Owner Information:**
ROYAL ROAD LINE INC
5490 N SALINAS AVE APT 116
FRESNO CA  93722-6289

**Lienholder Information:**
BMO HARRIS BANK N.A.
PO BOX 35707
BILLINGS MT  59107-5707

VEHICLE IS EXEMPT FROM ODOMETER REQUIREMENTS

## Request For Lien Change

Complete this section. Send the title and required fee to the Division of Motor Vehicles. Please check one box.

| ☐ Issue a title free of liens | ☐ Issue a title showing the following as the NEW LIEN HOLDER |
|---|---|
| LIEN RELEASE - Signature of lien holder (releasing interest)<br>X | Vehicle owner's signature requesting lien change |
| Title of signer | New lien holder's name |
| Date | Address |
| | City          State      ZIP Code |



**Division of Motor Vehicles**
**UTAH STATE TAX COMMISSION**
210 North 1950 West
Salt Lake City, Utah 84134

TC-127 Rev. 03/19 CDR



C 6517373

**Exhibit  6**



PO Box 3040
Cedar Rapids, IA 52406
Tel: 319-832-3543
Fax: 866-645-0374
bmo.com

November 29, 2023
VIA UPS
Nishan Singh
5675 N Fresno St # 116
Fresno, CA  93710

RE:      NOTICE OF DEFAULT RESPECTING GUARANTY

Dear Nishan Singh:

Reference is made to that certain Guaranty dated 12/30/2021, 03/10/2022, 03/07/2023, pursuant to which you absolutely and unconditionally guaranteed the obligations of Royal Road Line Inc ("Borrower") under that certain Loan Agreement(s) No. ███████, ███████, ███████ (collectively the "Loan") with BMO Bank N.A ("Lender").

As you know, Borrower is in default under the Loan for failing to make scheduled payments as and when due under the Loan. To date, Borrower is delinquent in its payments to Lender in the aggregate past due amount of $55,775.27, representing accrued, past due Loan payments, taxes and late fees, plus continually accruing fees, costs, default interest and expenses, including, without limitation, attorney's fees. As allowed in the Loan, the accelerated balance due as of the date of this letter is $407610.22, representing all principal, interest, taxes due and late fees. Guarantor will be responsible for all additional fees, costs and expenses, including without limitation, attorney's fees, accruing after this date.  As a result of the existing default, Lender may be currently seeking repossession of the 2024 Peterbilt 579 with vin 1XPBD49X3RD639014 Equipment securing the Loan.

If you have any questions, please contact the undersigned.

Sincerely,

*Micki D Koepke*
Micki Koepke
Litigation Team Lead
PH: 319-832-3543

CC: LITIGATION FILE

Remit to:
Transportation Finance
PO Box 71951
Chicago, IL  60694

IMPORTANT NOTICE: Nothing herein shall be construed as an approval or commitment to finance or for provision of other service by BMO Bank N.A. and its affiliates to any person. All transactions are subject to final investment/credit approval by BMO Bank N.A. and the execution of mutually satisfactory definitive documentation. Nothing contained herein shall be construed as any guarantee or promise of profitability or generation of revenue of any kind whatsoever. Nothing contained herein constitutes tax, accounting, financial or legal advice by BMO Bank N.A.

Classification: Confidential



PO Box 3040
Cedar Rapids, IA 52406
Tel: 319-832-3543
Fax: 866-645-0374
bmo.com

November 29, 2023
VIA UPS
Royal Road Line Inc
Attention: Nishan Singh
5490 N Salinas Ave Apt 116
Fresno, CA  93722

RE:       NOTICE OF DEFAULT AND ACCELERATION

Dear Nishan Singh:

Reference is made to that certain Loan Agreement(s) ███████, ███████, ███████ ("Agreement") between BMO Bank N.A. ("Lender") and Royal Road Line Inc ("Borrower"), pursuant to which Lender originally provided to Borrower financing for the equipment described in the Agreement ("Equipment").

As you know, Borrower is in default under the Agreement for failing to make the scheduled payments as and when due. As allowed in the Agreement, the accelerated balance due as of 11/28/2023 is $407,610.22, representing all principal, interest, taxes due and late fees. Borrower will be responsible for all additional fees, costs, and expenses, including without limitation, attorney's fees, accruing after this date. As a result of the existing default, Lender may be currently seeking repossession of the Equipment and hereby demands that all Equipment securing the Agreement be surrendered immediately.

No delay by Lender in exercising any rights or remedies, and nothing contained in this letter or otherwise, shall be deemed a waiver or election of any rights or remedies available to Lender as may be provided under the Agreement, any other instrument or agreement, or applicable law.  All rights and remedies available to Lender shall be cumulative and may be executed separately, successively or concurrently in its sole discretion, and all of such rights and remedies are reserved.

Sincerely,

*Micki S Koepke*

Micki Koepke
Litigation Team Lead
Tel: 319-832-3543

Remit to:
Transportation Finance
PO BOX 71951
Chicago, IL  60694

IMPORTANT NOTICE: Nothing herein shall be construed as an approval or commitment to finance or for provision of other service by BMO Bank N.A. and its affiliates to any person. All transactions are subject to final investment/credit approval by BMO Bank N.A. and the execution of mutually satisfactory definitive documentation. Nothing contained herein shall be construed as any guarantee or promise of profitability or generation of revenue of any kind whatsoever. Nothing contained herein constitutes tax, accounting, financial or legal advice by BMO Bank N.A.

Classification: Confidential